CALVERT FIRE INSURANCE COMPA-
NY, a corporation, and Central National
Insurance Company, a corporation,
Plaintiffs,

v.

UNIGARD MUTUAL INSURANCE COM-
PANY, Unigard Insurance Company,
Unigard Carolina Insurance Company,
Unigard Florida Insurance Company,
Unigard Illinois Insurance Company,
Unigard Ohio Insurance Company, Uni-
gard Security Insurance Company, each
a corporation, and Unigard Insurance
Group Mutual, a joint venture, Defend-
ants.

Civ. No. 77-0-272.

United States District Court,
D. Nebraska.

Oct. 9, 1980.

Francis P. Matthews and Martin A. Cannon, Omaha, Neb., for plaintiffs.

John R. Douglas, Omaha, Neb., Mark Abrams and Alan Martin, New York City, for defendants.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court after trial to the Court and submission of final written arguments. Jurisdiction is established under 28 U.S.C. § 1332. In this action, the plaintiffs, Calvert Fire Insurance Company [Calvert] of Baltimore, Maryland, and Central National Insurance Company [Central National] of Omaha, Nebraska, have filed suit against the defendants, specifically Unigard Mutual Insurance Company [Unigard] of Seattle, Washington, seeking rescission of various reinsurance treaties. After long and careful deliberation, the Court is now ready to make the following findings of fact and conclusions of law.

## BACKGROUND

At all times material to this lawsuit, there existed between Calvert and Central National agreements to share on a 50–50 basis the risks and profits of reinsurance[1] accepted by either in their assumed reinsurance division.

On June 19, 1975, Michael Cooper, of Guy Carpenter and Company [Guy Carpenter], San Francisco, California, a reinsurance intermediary,[2] in writing, invited the plaintiffs to participate in a reinsurance program for the Unigard Insurance Group, Excess and Special Risks Department.[3]

---

1. Reinsurance is defined as that transaction whereby a reinsurer, for a consideration, agrees to indemnify a reinsured or ceding company against all or part of the loss which the latter may sustain under the policy or policies which it has issued. A ceding company is the insurer which transfers all or part of the insurance it has written, and a reinsurer is the insurance company which assumes all or part of the insurance written by another insurer. 13A Appleman, Insurance Law and Practice § 7681, at 480–86 (1976).

2. A reinsurance intermediary acts between the two principals to the reinsurance transaction, negotiating and drafting the reinsurance treaty and handling all communications relating thereto. The intermediary may also transmit accounts, collect balances due, settle cash losses and handle other matters of detail in the working of the reinsurance transaction. Thompson, Reinsurance 222–23, 229–30 (4th ed. 1966).

3. As explained at trial, the Unigard's Excess and Special Risks Department was to write two types of insurance business: Excess and Sur-

Thereafter, on or about June 28, 1973, the plaintiffs executed four placement slips [4] by which it agreed to accept and reinsure certain risks of the defendant, Unigard. Said placement slips were later replaced by formal reinsurance treaties [5] executed by Calvert and Unigard on the following dates:

EXCESS CASUALTY REINSURANCE TREATY, FIRST LAYER

CALVERT—AUGUST 9, 1973
UNIGARD—NOVEMBER 27, 1973

EXCESS CASUALTY REINSURANCE TREATY, THIRD LAYER

CALVERT—AUGUST 9, 1973
UNIGARD—NOVEMBER 27, 1973

EXCESS PROPERTY REINSURANCE TREATY

CALVERT—OCTOBER 1, 1973
UNIGARD—OCTOBER 11, 1973

QUOTA SHARE REINSURANCE TREATY

CALVERT—JULY 2, 1974
UNIGARD—JULY 12, 1974

[Filing #66 at § 7].[6]

Through Pritchard & Baird, Inc., Morristown, New Jersey, another reinsurance intermediary, the parties entered into a fifth treaty known as the Special All Risk Reinsurance Agreement [All Risk Treaty] effective July 1, 1973. The formal agreement was executed by Unigard on March 8, 1974, and by Central National on January 28, 1974 [Filing # 66 at § 9].

The parties operated under the Quota Share and Excess Layered Treaties until December, 1974, when the contracts were terminated as a result of cancellation notices exchanged by the parties in September, 1974. The All Risk Treaty was mutually terminated effective July 1, 1974 [Filing # 66 at § 9, ¶ 10]. Reports continued to be rendered by Unigard on the runoff of the business reinsured.

On August 22, 1977, the plaintiffs initiated this action seeking rescission of these reinsurance agreements. The basis of this action is twofold. First, the plaintiffs claim that Unigard, in the letter of June 19, 1973, from Michael Cooper of Guy Carpenter to the plaintiffs, made false and fraudulent representations regarding Unigard's reinsurance program in order to induce plaintiffs to enter into said program and that plaintiffs, relying thereon, did enter into this program to their detriment. Second, the plaintiffs claim that Unigard failed to render timely and accurate reports and keep accurate records as required under the terms of the reinsurance agreements, thereby materially breaching said agreements.

Unigard, by its answer, denies that it made any misrepresentations to the plaintiffs or materially breached the agreements and further contends that, even assuming that it did so, the plaintiffs' action is barred

plus Lines business. Excess Lines business is the writing of very large accounts for national type insureds, e. g., layered liability coverages for General Motors. Surplus Lines business is the writing of hard to place risks, known as substandard business, e. g., restaurants, inner-city businesses [Tr. 364:24–25; 365:25–366:15; see Ex. # 48].

4. A placement slip is also known as a cover slip. The slip serves as a contract between the parties until the formal contractual documents are issued. [Tr. 306:19–24].

5. A reinsurance treaty is an agreement between two insurance companies by which one agrees to cede and the other agrees to accept reinsurance business pursuant to the terms of the treaty. 13A Appleman, Insurance Law and Practice § 7681, at 483 (1973). Once the reinsurance treaty is issued, it takes the place of the placement slip. See Note 4, supra.

6. Except where material, the Court will refer to the Excess Casualty Reinsurance Treaty, First Layer; the Excess Casualty Reinsurance Treaty, Third Layer; and the Excess Property Reinsurance Treaty collectively as the Excess Layered Treaties. The Quota Share Reinsurance Treaty shall be referred to as the Quota Share Treaty.

by the applicable statute of limitations and the doctrines of waiver and ratification. Unigard has also filed a counterclaim seeking the balance already allegedly due under the treaties, any payments which will subsequently become due, prejudgment interest and attorneys' fees.

## SUMMARY OF FACTS

### The Unigard-Allen, Miller Relationship

In late 1971, Unigard became interested in establishing an Excess and Special Risks Department and obtaining reinsurance to protect that facility [Tr. 365:17–24; 366:21–367:5]. At about that same time, James W. (Bill) Allen was considering terminating his employment with C. V. Starr & Co., San Francisco, California, an excess and surplus lines underwriting management agency [Tr. 367:24–368:2], and establishing his own independent firm to write excess and special risks business [Tr. 367:13–14; Seery depo. (11/3/78) 11:22–12:6; see also Ex. # 1 and # 2]. In September of 1971, officers of Unigard were introduced to Mr. Allen and after some negotiations an agency agreement was entered into between Mr. Allen's company, Allen, Miller & Associates [Allen, Miller], San Francisco, California, and Unigard, effective March 15, 1972 [Ex. # 13; Tr. 367:18–368:13]. On May 30, 1972, Unigard issued a news release regarding the arrangement with Allen, Miller [Ex. # 11; Tr. 379–25–380:5].

Under this arrangement, Allen, Miller was authorized, *inter alia*, to issue and terminate contracts of insurance, to have full underwriting authority, to collect premiums and pay claims, to negotiate reinsurance agreements by treaty, to place facultative reinsurance, to keep all necessary records, to issue quarterly reports, to keep all monies collected until rendering a report thereon 60 days after the close of each quarter, with the right to invest such sums in the interim and to retain the income therefrom, and generally to do everything necessary for the management of the insurance business conducted pursuant to the agreement. [Ex. # 13; see also Ex. # 209 and # 256]. Indeed, in discussing the nature of this arrangement, Robert Seery, Vice-President of Reinsurance Division at Unigard [Tr. 364:8–17; Seery depo. (3/11/78) 7:11–16], explained that it was considered a managing general agency [Tr. 368:14–17; Seery depo. (11/3/78) 38:16–39:1], as opposed to an ordinary agency.[7]

### The Reinsurance Program

Around this period of time, Unigard was also in contact with Michael Cooper of Guy Carpenter, regarding the placement of reinsurance to protect the new Unigard excess and special risks facility [Cooper depo. 18:25–19:3; 19:20–22; 20:15–21:15; 21:17–22:8; 31:28–33:13]. On March 10, 1972, Unigard formally appointed Guy Carpenter as reinsurance intermediary, to negotiate certain reinsurance agreements for Unigard [Ex. # 5; Tr. 377:15–20; Cooper depo. 18:7–17].

While the formal treaty documents had not been completely drafted at this time, it was essentially March 15, 1972, the effective date of Unigard's agency agreement with Allen, Miller, that Unigard's reinsurance program became operational [Cooper depo. 37:13–16; 40:8–25].

As set up, the reinsurance program operated on a layered basis. The first layer was the Quota Share Treaty which covered the first $500,000.00 of risk [Tr. 368:18–25]. Under the Quota Share Treaty, a reinsurer has a certain percentage share of the risk and a certain percentage share of the premium [Tr. 438:13–18; Cooper depo. 20:4–7]. For example, when the program began, Unigard retained a 20% position in the Quota Share, placed 20% directly without the

---

7. A managing general agent is recognized as one with unlimited authority to underwrite, to appoint other agents, to produce business, to collect premiums and to service claims [Tr. 69:11–15; 76:5–8; 105:23–106:3; Seery depo. (11/3/78) 39:2–13]. By contrast, the authority of an ordinary agent is quite limited. While the ordinary agent performs functions similar to those performed by a managing general agent, the insurance company holds final underwriting authority, handles the claims activities, keeps the books and does the accounting on the policy [Tr. 76:9–17; 106:3–10; Seery depo. (11/3/78) 39:2–13].

use of an intermediary, and had the remaining 60% placed by Guy Carpenter [Tr. 369:4–6; Cooper depo. 37:13–38:1].

The next layer consisted of the Excess Layered Treaties. These treaties covered risks in excess of the $500,000.00 Quota Share Treaty limit up to a maximum of $5,000,000.00 [Tr. 369:6–18]. These treaties were also placed by Guy Carpenter, and, like the Quota Share Treaty, the reinsurers on these treaties had a percentage of the risk and a percentage of the premiums [Cooper depo. 38:17–39:1].

As mentioned earlier, Unigard and the plaintiffs also entered into an All Risk Treaty through Pritchard & Baird, Inc. [Tr. 369:19–22]. This treaty provided coverage up to $500,000.00 [Seery depo. (9/26/79) 34:4–7] and could be used interchangeably with the Quota Share Treaty to provide coverage for those insurance lines excluded by that treaty as the All Risk Treaty had fewer exclusions [Tr. 369:25–270:1; Seery depo. (9/26/79) 36:10–37:9].

The last layer consisted of facultative reinsurance.[8] This reinsurance provided coverage over and above the Quota Share, Excess Layered and All Risk Treaties, thereby permitting Allen, Miller, who could place this reinsurance itself pursuant to its agreement with Unigard [Ex. # 13], to further increase the size of the risk it could write [Tr. 370:3–9].

*Central National's and Calvert's Involvement in the Program*

Shortly before June of 1973, one of the original reinsurers on the Quota Share and Excess Layered Treaties, New England Reinsurance Corporation [NERCO] which had a 35% position in the Quota Share, informed Mr. Cooper that it desired to terminate its contracts as of July 1, 1973 [Tr. 388:14–18; Cooper depo. 41:1–11]. Informed of NERCO's decision, Unigard instructed Mr. Cooper to increase its participation on the Quota Share Treaty by 10%

and replace the remaining 25% [Cooper depo. 45:21–22; 46:21–24; Tr. 388:14–389:7].

Thereafter, Mr. Cooper, in order to replace the remaining 25% on the Quota Share Treaty, wrote Robert Sias, Vice-President of Reinsurance Division at Central National [Tr. 94:18–19] to invite Central National's participation in Unigard's reinsurance program [Ex. # 28]. As this document forms the basis of plaintiff's allegations of misrepresentation, the Court will proceed to an examination of the contents contained therein.

In the June 19, 1973, letter inviting Central National's participation in the Unigard's reinsurance program, Mr. Cooper captioned the letter:

### UNIGARD INSURANCE GROUP

#### Excess and Special Risks Department

A similar caption is set forth on the statement of "Underwriting Information" and on each of the two sheets of performance figures accompanying the cover letter. Following the performances figures were the placement slips regarding the four reinsurance treaties. In setting forth what business the reinsurance agreements would cover, each placement slip stated in pertinent part that it covered a specified portion "... of all business written in the Reassureds Excess and Special Risks Department." The only reference in the material sent by Mr. Cooper regarding Allen, Miller and its functions was the single statement in the Underwriting Information that "Underwriting is performed by Allen, Miller & Associates of San Francisco and New York." [Ex. # 28].

In the June 19 letter, Mr. Cooper also set forth the projected premium income under the treaties for the twelve months starting July 1, 1973. In this regard, he wrote:

---

8. Facultative reinsurance is the individual placement, offer and acceptance between the insurance company and reinsurance company of every risk that is being placed. It can be accepted or rejected on an individual basis [Tr. 364:23–24; 446:6–9; 447:15–18]. In this respect it differs from the treaties discussed above, in that under the terms of those treaties, the reinsurer is obligated to accept what has been offered [Tr. 446:9–12].

The estimated premium income under the various Covers for the twelve months starting July 1, 1973 is as under:

(1) Quota Share—$10,000,000 for 100%.

(2) Liability subject earned premium $4,000,000, developing a reinsurance premium of $1,000,000 on the three Liability Covers.

(3) Property Excess—$2,000,000 developed reinsurance premium at the rate of 40% of G.O.P. of risks attaching. [Ex. # 28].

Finally, the placement slips and the reinsurance treaties which replaced them provided that the plaintiffs, in addition to providing reinsurance on policies written after July 1, 1973, would also provide reinsurance on risks represented by unearned premiums on policies in effect on June 30, 1973.[9] In this regard, the experience figures attached to Mr. Cooper's letter of June 19, 1973, showed the written premium for the period April 1, 1972 to March 31, 1972, under the various treaties to be $6,149,025.00, the earned premium for the same period to be $3,264,586.00, thereby leaving an unearned premium portfolio of $2,884,439.00 to be assumed by the reinsurers on July 1, 1973 [Ex. # 28].

On or about June 28, 1973, Mr. Sias executed the placement slips, thereby agreeing to accept and reinsure certain risks of Unigard [See Ex. # 28]. As mentioned earlier, these placement slips were later replaced by formal reinsurance agreements [Ex. # 252A–# 255A].

*Reporting and Termination*

During this period of time, Unigard did not render any report to the plaintiffs within sixty days of the close of the Second Quarter of 1973[10] other than a letter dated September 25, 1973, from Guy Carpenter reporting the 100% unearned premium portfolio on June 30, 1973, to be $3,564,348.87 [Ex. # 41; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. Thereafter, the plaintiffs began receiving various quarterly reports. The Third Quarter 1973 report received by the plaintiffs on January 4, 1974, showed the unearned premium portfolio transfer of July 1, 1973, to be $6,411,320.88 [Ex. # 235; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. The Fourth Quarter 1973 account received by the plaintiffs on March 8, 1974, represented the unearned premium portfolio transfer to be $8,482,098.70 [Ex. # 237; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. The First Quarter 1974 report, received by plaintiffs on July 15, 1974, represented the July 1, 1973, unearned premium portfolio transfer to be $8,394,511.10 [Ex. # 238; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. This figure was subsequently revised to $9,128,592.79 [Ex. 258, Defendant's answers to Interrogatory # 6]. Likewise, throughout these quarters, premium income written for the various covers from April 1, 1972, to June 30, 1973, began to increase drastically. [See Ex. # 258, Defendant's answers to Interrogatory # 1].

In August of 1974, officers at Unigard began discussing the termination of its agency agreement with Allen, Miller [Ex. # 65 and # 68]. On August 8, 1974, Mr. Allen, of Allen Miller, sent notice of its intent to terminate the agreement effective

9. In this opinion, the Court will refer to the unearned premiums on the policies in effect on June 9, 1973, which the plaintiffs and the other reinsurers were obligated to assume under the treaties as the "unearned premium portfolio transfer."

The unearned premium portfolio for a certain period is determined by subtracting the earned premiums for a certain period from the written premium for the same period. [Tr. 111:22–112:11; 313:7–313:8].

10. The cover slips and the treaties covering the Excess Property and the Quota Share provide that the company shall provide quarterly reports as soon as practicable "but not exceeding sixty (60) days after the close of each quarter" and that the balances due thereunder shall be paid "within sixty (60) days after the close of each quarter" [Ex. # 252A and # 255A]. The cover slips and treaties covering the Casualty Excess First and Third Layers provide that quarterly reports shall be rendered by the reinsured "as soon as practicable" following the close of each quarter and "premiums shall be promptly paid following the close of the quarter accounted for." [Ex. # 252A and # 254A].

October 15, 1974 [Ex. # 67]. Thereafter, the parties executed a memorandum agreeing that the agency agreement would terminate on October 15, 1974 [Seery depo. (11/3/78) 62:19–63:15].

On September 27, 1974, the plaintiffs sent Unigard its notice of cancellation of the Quota Share and Excess Layered Treaties, effective December 31, 1974 [Ex. # 75A, B, C]. On October 2, 1974, Mr. Cooper wrote Central National enclosing a notice of cancellation of the treaties dated September 26, 1974, from Unigard, effective December 31, 1974 [Ex. # 76A, B].

On October 3, 1974, the plaintiffs received the Second Quarter 1974 report which indicated the July 1, 1973, unearned premium portfolio transfer to be $9,099,474.42 [Ex. # 239; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. On April 4, 1975, the plaintiffs received the Third Quarter 1974 report showing the July 1, 1973, unearned premium portfolio to be $9,915,957.74 [Ex. # 250; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. On May 27, 1975, the plaintiffs received the Fourth Quarter 1974 account indicating the unearned premium portfolio transfer of July 1, 1973, to be $10,417,286.81 [Ex. # 241; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. Again, throughout these quarters the actual premium income written for the treaties continued to rise [See Ex. # 258; Defendant's answers to Interrogatory # 1].

Around this period of time, Unigard personnel began traveling to San Francisco to reconstruct Allen, Miller's records. [See Ex. # 81, # 85, # 90, # 92, # 93, # 96, # 98, # 200, # 205]. On November 11, 1975, the First Quarter 1975 report, the first report issued by Unigard was received by the plaintiffs. In this report, the unearned premium portfolio transfer of July 1, 1973, was shown to be $17,133,845.00, a jump of approximately $7,000,000.00 from the last report, and the written premium for the period July 1, 1973 to December 31, 1973, was shown to be $12,343,966.35 [Ex. # 242; see also Ex. # 270; Ex. # 258,

Defendant's answers to Interrogatory # 6]. That same date, the plaintiffs received from Unigard the Second Quarter 1975 report indicating the unearned premium portfolio transfer to be $17,039,858.42, and the written premium for the period July 1, 1973 to December 31, 1973, to be $13,057,001.36 [Ex. # 242; see also Ex. # 270; Ex. # 258, Defendant's answers to Interrogatory # 6]. Actual premium income written under these treaties from April 1, 1972 to June 30, 1973, rose drastically from approximately $15,000,000.00 for the Fourth Quarter 1974 to approximately $25,000,000.00 for the First and Second Quarters of 1975 [See Ex. # 258, Defendant's answers to Interrogatory # 1].

In December of 1975, Earl Watters, Comptroller at Central National [Tr. 236:18–21], was informed by Central National's Reinsurance Division that the figures furnished by Unigard in the reports received in November of that year were incorrect. Consequently, he refused to honor further reports, or make any payments to Unigard pending clarification [Ex. # 230; Tr. 236:2–11; 237:23–238:2].

Subsequently, efforts to obtain accurate figures were made by Central National on a number of occasions through 1976 [Ex. # 216, # 217, # 220, # 220A]. However, during an inspection visit to Unigard by Ken Johnson, head of Central National's Reinsurance Claims Department [Tr. 166:8–10], he was told by Mr. Seery that it would be as long as six months to a year before the obvious errors in the figures could be corrected [Tr. 200:11–201:4].

On December 17, 1976, a meeting was held by the principals of Central National, Calvert and Unigard in an attempt to resolve their differences. The effort was unsuccessful [Ex. # 231].

In April of 1977, Central National retained James H. Von Gunten, a reinsurance consultant [Tr. 244:13–14] to review Central National's and Unigard's files and advise Central National regarding the situation [Tr. 248:25–249:3]. Mr. Von Gunten's preliminary observations were received on April 7, 1977 [Ex. # 259].

On April 15, 1977, a second meeting was held between the executives of Central National and Unigard in an attempt to arrive at a settlement. Again, this effort was unsuccessful [Tr. 486:5–7; 84:2–14; 85:8–16; Seery depo. (9/26/79) 67:20–69:22].

Thereafter, arrangements were made for Mr. Von Gunten to make a full scale audit of Unigard on behalf of the plaintiffs [Tr. 250:4–7]. Mr. Von Gunten's report was received on July 8, 1977 [Ex. # 234]. On August 22, 1977, the plaintiffs initiated this action for rescission, tendering back premiums received by them under the treaties.[11]

*The All Risk Treaty*

On May 17, 1973, Joseph L. Kelley, of Pritchard & Baird, Inc., wrote Mr. Sias inviting Central National's participation in a fifth treaty, an All Risk Treaty [Ex. # 143]. Mr. Kelley's letter was captioned:

Unigard Mutual Insurance Company
for the account
Allen, Miller Associates

At the bottom of the cover letter, Mr. Kelley wrote: "Unigard is making its mark in the excess and surplus lines field. We have good reason to believe the growth pattern will be solid and consistent with Unigard's performance in the past." Attached to the cover letter was a memorandum containing a similar caption on each of its pages. At the end of the memorandum was some information regarding the employees of Allen, Miller [Ex. # 263].

With respect to the premiums ceded to reinsurers from inception May 1, 1972, through March 31, 1973, Mr. Kelley, in his letter wrote: "We note that Premiums ceded to Reinsurers from inception May 1, 1972 through December 31, 1972 amounted to $210,834; first quarter has indicated an additional $127,871 with one loss of $100,000 reserved." Thereafter, in his memorandum, Mr. Kelley stated that projected premium volume was $450,000.00 to $500,000.00 per year [Ex. # 263].

11. Throughout this period of time, the plaintiffs were still receiving quarterly reports [*See* Ex. # 243–51 and # 270]. These reports indicate that from the reports received in November of 1975 and thereon, the figures for the unearned premium portfolio transfer of July 1, 1973, and the written premium income for the period

The All Risk Treaty became effective July 1, 1973, with Unigard executing the formal treaty agreement on March 8, 1974, and Central National executing said agreement on January 28, 1974 [Ex. # 143]. The agreement was mutually terminated effective July 1, 1974 [*see* Filing # 66 at ¶ 9].

On March 31, 1979, Unigard issued a report indicating that first year volume for the treaty was $2,033,670.89 and succeeding year volume was $4,755,430.22 [Filing # 45, Ex. C].

GOVERNING LAW

This being a diversity action, at the outset the Court is faced with the determination of what state law governs the issues involved herein. In their final written argument, the plaintiffs raise, for the first time, the possibility that the law of California or Washington, rather than the law of Nebraska, is applicable to the issues raised in this case. Prior to that time, this Court was of the impression, by reason of its view of the case and the contentions of the parties involved, that Nebraska law governed this action. Nevertheless, assuming that a conflict exists between the laws of these states, it is clear, as the following discussion will demonstrate, that the Court's initial impression was correct.

It has long been established that in a diversity action, in a conflict of laws situation, a federal district court must apply the conflict of laws rule of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Seedkem v. Safranek*, 466 F.Supp. 340 (D.Neb.1979); *Epperson v. Christenson*, 324 F.Supp. 1121 (D.Neb.1971). The question then presented is what conflict of laws rule the Nebraska Supreme Court has held applicable in this situation.

April 1, 1972, to June 30, 1973, stabilized at approximately $17,000,000.00 to $18,000,000.00 and $25,000,000.00 to $26,000,000.00 respectively [See Ex. # 258, Defendant's answer to Interrogatories # 1 and # 6; see also Ex. # 270].

This Court's research has failed to disclose any Nebraska choice of law rules dealing particularly with an action for rescission of a reinsurance agreement on the basis of misrepresentation and nonperformance. Under these circumstances, the Court believes that the approach taken by Judge Robinson of this Court in the case of *Fullington v. Iowa Sheet Metal Contractors*, 319 F.Supp. 243 (D.Neb.1970), should be applied in this case. In *Fullington*, Judge Robinson wrote:

> Since this Court is not bound by the Nebraska pleading rule it was necessary in the present case to determine whether Nebraska or Iowa law applied, because Nebraska itself has no choice of law rule governing the type of action herein involved. This Court being free to fashion a choice of law rule of its own, adopted the modern trend in this area, of isolating the particular issue and then applying the law of the state having the most significant contacts with that particular issue. Here, the particular issue involved is the injury to the plaintiff, and the state having the most significant contact with that issue is Iowa, since that is where the injury occurred. This Court's instructions on the law of this case were in accord with present Iowa law.

*Fullington v. Iowa Sheet Metal Contractors, supra*, 319 F.Supp. at 245. Applying the most significant contacts analysis of *Fullington* to the issues involved in this litigation makes clear that Nebraska law applies.

Plaintiffs' original complaint alleged that the defendant companies were corporations of six different states and that Central National was a Nebraska corporation with its principal place of business in Nebraska. Plaintiffs further alleged that Central National and Calvert had entered into an agreement to share the risks and profits of the proposed reinsurance scheme on a 50–50 basis and that "all these acts were performed in whole or in part in Nebraska." [Filing # 1 at ¶ V]. Plaintiffs also alleged that "in or about June of 1973, the defendants, in Omaha, Nebraska, through their broker of record, submitted a written offer to Central National . . . ." [Filing # 1 at ¶ IV]. Plaintiffs then alleged that by reason of the fraud that induced plaintiffs to enter into the treaties, said treaties are void from inception. Likewise, in their first amended complaint, plaintiffs alleged that "on or about June 19, 1973, Unigard, in Omaha, Nebraska, through its negotiating agent, Guy Carpenter & Company, Inc., submitted a written offer to Central National which proposed that Central National reinsure a portion of the insurance issued by Unigard . . . ." [Filing # 34 at ¶ V]. As noted previously, this written offer, which was sent to Omaha, Nebraska, contained placement slips for Central National to execute. Said placement slips were executed by Robert Sias, an officer of Central National. Similarly, the treaty agreements which replaced the placement slips as the formal contractual documents, were executed by Mr. Sias.

Moreover, the theory of plaintiffs' cause of action is that the representations made in Omaha, Nebraska by Guy Carpenter on behalf of Unigard, were made with knowledge of their falsity or as positive statements of fact without knowledge thereof and with reckless disregard as to their truth. In other words, the plaintiffs have, in effect, alleged that a tort was committed upon them in Nebraska for which they seek rescission.

In sum, Nebraska is the jurisdiction in which the offer to the plaintiffs was submitted, the jurisdiction in which the offer was accepted, the jurisdiction in which the alleged misrepresentations were committed, the jurisdiction in which the treaties were executed by the plaintiffs, the jurisdiction in which the main plaintiff, Central National, is incorporated and has its principal place of business, and, finally, the jurisdiction in which the plaintiffs have suffered any damages. Indeed, Nebraska is the jurisdiction in which the meetings between the officers of the plaintiffs and Unigard were held in 1976 and 1977 in an attempt to settle this matter.

By contrast, the California and Washington contacts with this litigation are, at

the most, quite minimal. California's only contact with this matter is that Allen, Miller and Guy Carpenter are located there. Yet, Allen, Miller had no contractual relationship with the plaintiffs. And, while Guy Carpenter negotiated and placed the reinsurance, handled communications and sent periodic bills to the plaintiffs, the end result of its functions occurred in Nebraska. Likewise, Washington's only contact with this action is that it is the state of Unigard's residency.

Therefore, it is clear from the above discussion that Nebraska is the state with the most significant contacts with the issues involved in this litigation. Accordingly, this Court, in making its determination herein, will look to applicable Nebraska law.

RESCISSION—MISREPRESENTATION

As noted previously in this opinion, the plaintiffs' main theory in support of their claim for rescission of these reinsurance agreements is that Unigard allegedly made various misrepresentations at the inception of these agreements which induced plaintiffs to enter into these agreements, ultimately to their detriment. Briefly stated, the plaintiffs contend that Unigard misrepresented the true status of Allen, Miller and its "Excess and Special Risks Department", and the premium volume and unearned premium portfolio portion of that volume as of March 31, 1973, in the June 19, 1973, letter written by Mr. Cooper of Guy Carpenter, on Unigard's behalf.

Before proceeding to a consideration of the merits of these allegations, it is necessary to review the present state of Nebraska law in the area of misrepresentation.

*Applicable Law*

Throughout this lawsuit, the parties have disagreed as to what are the essential elements of misrepresentation. Essentially, this disagreement has centered on the question of whether the plaintiffs must prove scienter or an "intent to deceive" as one of the essential elements. Unigard, of course, argues that proof of scienter in terms of an intent to deceive is an essential element of misrepresentation. On the other hand, the plaintiffs argue that in an action for rescission based on false representations, proof of scienter is unnecessary. A brief review of Nebraska law will make these positions clearer.

The essential elements of a cause of action for rescission based on misrepresentation has been set forth on various occasions by the Nebraska Supreme Court. In *Russo v. Williams*, 160 Neb. 564, 571, 71 N.W.2d 131, 138 (1955), the court wrote as follows:

> To maintain an action for rescission because of false representations the party seeking such relief must allege and prove what representations were made; that they were false and so known to be by the party charged with making them or else were made without knowledge as a positive statement of known fact; that the party seeking relief believed the representations to be true; and that he relied and acted upon them and was injured thereby.

*Accord, Anson v. Grace*, 174 Neb. 258, 117 N.W.2d 529 (1962); *Wegner v. West*, 169 Neb. 546, 100 N.W.2d 542 (1960); *Caruso v. Moy*, 164 Neb. 68, 81 N.W.2d 826 (1951).

However, the list of essential elements set forth above has not been restricted solely to actions for rescission. On numerous occasions, the Nebraska Supreme Court has set forth essentially the same elements in many other types of actions. *See, e. g., Smith v. Wrehe*, 199 Neb. 753, 261 N.W.2d 620 (1978) (action to recover balance due; action defended on ground of false representation); *Moser v. Jeffrey*, 194 Neb. 132, 231 N.W.2d 106 (1975) (action for damages for false representations); *Buhrman v. International Harvester Co.*, 181 Neb. 633, 150 N.W.2d 220 (1967) (action for civil conspiracy based on fraud); *Cook Livestock Co. v. Reisig*, 161 Neb. 640, 74 N.W.2d 370 (1956) (action for damages for false representations); *Campbell v. C & C Motor Co.*, 146 Neb. 721, 21 N.W.2d 427 (1946) (action at law for false representations); *Paul v. Cameron*, 127 Neb. 510, 256 N.W. 11 (1934) (action for damages on the basis of fraud); *Peterson v. Schaberg*, 116 Neb. 346, 217 N.W. 586 (1928) (action for damages for deceit).

Yet, in 1969, in the case of *Transportation Equip. Rentals, Inc. v. Mauk*, 184 Neb. 309, 167 N.W.2d 183 (1969), the Nebraska Supreme Court unexplainedly added a new element to the list—"intent to deceive." In this regard, the court wrote:

The essential elements required to sustain an action for fraud are, generally speaking, that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; *that it was made with intent to deceive* and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage. [Emphasis added].

*Transportation Equip. Rentals, Inc. v. Mauk, supra,* 184 Neb. at 312, 167 N.W.2d at 186. From that point on, the Nebraska Supreme Court on numerous occasions reiterated the essential elements as set forth in *Mauk. See, e. g., Luscher v. Empkey,* 206 Neb. 572, 293 N.W.2d 866 (1980); *Novotny v. McClintick,* 206 Neb. 99, 291 N.W.2d 252 (1980); *Negus, Sweenie Inc. v. Beaver Lake Corp.,* 202 Neb. 671, 276 N.W.2d 668 (1979); *Page v. Andreason,* 200 Neb. 641, 264 N.W.2d 682 (1978); *Bellairs v. Dudden,* 194 Neb. 5, 230 N.W.2d 92 (1975).

Thus, from the foregoing review of the Nebraska law on this subject, the positions of the parties become even more apparent. The plaintiffs argue that this being an action for rescission based on misrepresentation, the essential elements of *Russo v. Williams, supra,* should be applied and that proof of scienter or an "intent to deceive" should be unnecessary. On the other hand, Unigard, relying on *Transportation Equip. Rentals, Inc. v. Mauk, supra,* and its progeny, contends that the essential elements contained in those cases should be applied herein and, therefore, that the plaintiffs must prove scienter or an intent to deceive on Unigard's part.

In support of its position, the plaintiffs argue that the differences in the proof requirements lies in the distinction between an action brought at law and an action brought in equity, as here. In essence, plaintiffs contend that in an action at law for misrepresentation, proof of scienter is necessary. On the other hand, the plaintiffs claim that in an action brought in equity, for example, for rescission, based on misrepresentation, proof of scienter is unnecessary.

However, this claimed distinction does not seem to find support in Nebraska law. True, in many early cases, the Nebraska courts repeatedly stated that in actions based on false representations, it was not necessary to prove scienter. Yet, a review of those cases indicates that those courts, in holding that scienter was unnecessary, did not distinguish between actions at law or actions brought in equity. *See Paul v. Cameron, supra* (action for damages; not necessary to allege or prove scienter); *Kuhlman v. Shaw,* 91 Neb. 469, 136 N.W. 55 (1912) (action for damages; not necessary to aver or prove scienter); *Omaha Elec. Light & Power Co. v. Union Fuel Co.,* 88 Neb. 423, 129 N.W. 989 (1911) (action for damages for deceit and fraud; proof of scienter in an action for fraud and deceit not necessary); *Gerner v. Mosher,* 58 Neb. 135, 78 N.W. 384 (1899) (action for damages for false representation; not necessary to prove scienter); *Johnson v. Gulick,* 46 Neb. 817, 65 N.W. 883 (1896) (defendant counterclaimed for damages based on false representation; proof of scienter held unnecessary). Indeed, in *Maser v. Lind,* 181 Neb. 365, 148 N.W.2d 831 (1967), the most recent case in which the Nebraska Supreme Court held that proof of scienter is unnecessary and a case upon which the plaintiffs place much reliance, the plaintiffs were seeking *damages* for fraud, not rescission.

Moreover, as noted earlier in this discussion, prior to the *Mauk* decision, the essential elements necessary to be proved in numerous cases brought at law were essentially the same as the elements required to sustain an action for rescission on the basis of misrepresentation. In each case, there was no requirement that scienter or intent to deceive be proved. *See also Swanson Petroleum Corp. v. Cumberland,* 184 Neb. 323, 167 N.W.2d 391 (1969); *Allied Bldg.*

*Credits, Inc. v. Damicus*, 167 Neb. 390, 93 N.W.2d.210 (1958).

A consideration of the Nebraska Supreme Court's approach on the equity side, likewise, indicates that that equity-law distinction put forth by the plaintiffs does not seem to be followed under Nebraska law. In *Bellairs v. Dudden, supra*, the plaintiffs brought suit to enforce a constructive trust on the basis of fraud. Although this was purely an equitable action, the Nebraska Supreme Court, quoting from the *Mauk* decision, held that one of the essential elements required to sustain an action for fraud was that the representation "was made with intent to deceive . . . ." *Bellairs v. Dudden, supra*, 194 Neb. at 13, 230 N.W.2d at 97.

However, the fact that this equity-law distinction does not find support under Nebraska case law does not necessarily mean that in this case the plaintiffs must prove that Unigard made its various misrepresentations with "intent to deceive." A review of the *Mauk* decision and some of the case law thereafter will shed more light on this proposition.

As noted earlier, it was in the 1979 case of *Transportation Equip. Rentals, Inc. v. Mauk, supra*, that the Nebraska Supreme Court unexplainedly added a new element to the list of essential elements required to be proved in an action for misrepresentation. In so doing, the *Mauk* court cited to the case of *Campbell v. C & C Motor Co., supra*. Yet, nowhere in the Campbell case was the requirement of scienter or "intent to deceive" included among the essential elements set forth therein. *Campbell v. C & C Motor Co., supra*, 146 Neb. at 723–24, 21 N.W.2d 427. Moreover, in the *Mauk* decision, the Nebraska Supreme Court made no reference to the *Maser* case which was decided a mere two years earlier and in which the court held that proof of scienter was unnecessary.

As discussed earlier, since the *Mauk* decision, the Nebraska Supreme Court has, on various occasions, reiterated the essential elements contained in that case in other decisions. However, this has not always been the case.

In *Swanson Petroleum Corp. v. Cumberland, supra*, the plaintiff sought damages for the value of goods allegedly obtained by the defendant by false pretenses. While this case was decided merely a week after *Mauk*, the court, in setting forth the essential elements for fraud, made no reference to the requirement of "intent to deceive" or the *Mauk* decision. *Swanson Petroleum Corp. v. Cumberland, supra*, 184 Neb. at 330, 167 N.W.2d at 396.

Thereafter, in the case of *Mid-States Equip. Co. v. Evans*, 191 Neb. 230, 214 N.W.2d 496 (1974), the plaintiff brought an action for damages on the basis of fraud. Judgment was rendered for the plaintiff in the lower court and the defendant appealed. On appeal, the defendant asserted as error the giving of an instruction which states that one element of fraud is that false representations were made, knowing them to be false or without knowledge of their truth or falsity as a positive statement of fact. The Nebraska Supreme Court found no error, stating as follows:

> Defendant asserts error in an instruction which permitted a finding of fraud if "the representations were submitted by the defendant without knowledge of the truth or falsity of the same as a positive statement of fact." No authorities are cited. In regard to this element of fraud we have heretofore approved the criterion criticized. See, *Campbell v. C & C Motor Co.*, 146 Neb. 721, 21 N.W.2d 427; *Swanson Petroleum Corp. v. Cumberland*, 184 Neb. 323, 167 N.W.2d 391.

*Mid-States Equip. Co. v. Evans, supra*, 191 Neb. at 231–32, 214 N.W.2d at 497–98.

Significantly, in a concurring opinion, Judge Spencer wrote:

> Appellant in this action contends that intent is an element of fraud in Nebraska. He relies upon *Transportation Equipment Rentals, Inc. v. Mauk* (1969), 184 Neb. 309, 167 N.W.2d 183, the first syllabus point of which reads: "The essential elements required to sustain an action for fraud are, generally speaking, that a representation was made as a

statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; *that it was made with intent to deceive and for the purpose of inducing the other party to act upon it*; and that he did in fact rely on it and was induced thereby to act to his injury or damage." (Italics supplied.) The statement "that it was made with intent to deceive and for the purpose of inducing the other party to act upon it" crept into that case by inadvertence and had no bearing on the result reached. Our law is otherwise. See, *Swanson Petroleum Corp. v. Cumberland* (1969), 184 Neb. 323, 167 N.W.2d 391; *Allied Building Credits, Inc. v. Damicus* (1958), 167 Neb. 390, 93 N.W.2d 210; *Campbell v. C & C Motor Co.* (1946), 146 Neb. 721, 21 N.W.2d 427.

*Mid-States Equip. Co. v. Evans, supra,* 191 Neb. at 232–33, 214 N.W.2d at 498.

In 1978, in the case of *Smith v. Wrehe, supra,* the plaintiff brought suit to recover the balance due on the purchase price of a contract for the sale of a taxicab company. The defendant prayed for dismissal on the ground that he had been induced to sign the contract because of plaintiff's false representation. In setting forth the essential elements, the court made no mention of the element of "intent to deceive." *Smith v. Wrehe, supra,* 199 Neb. at 757–58, 261 N.W.2d at 623–24.

Finally, in the recent case of *Ames Bank v. Hahn,* 205 Neb. 353, 287 N.W.2d 687 (1980), the Nebraska Supreme Court shed some light on the problems created by the *Mauk* decision. In *Ames Bank,* the plaintiff filed the following petition, as described in pertinent part by the Nebraska Supreme Court:

The amended petition alleged in its first cause of action that the defendant Hahn was a lawyer associated with and employed by the defendants, Warren S. Zweiback, Mark L. Laughlin, and Zweiback & Laughlin, a partnership; that on October 14, 1974, Bruce N. Miller, as president of E. G. Miller Realty Company, delivered a promissory note in the amount of $153,358.60 to the plaintiff; that Hahn and Zweiback & Laughlin represented Bruce N. Miller, a partner in Minnesota Candlewood Company; that on November 7, 1974, Hahn prepared two mortgages from Candlewood to the plaintiff which were intended to secure the E. G. Miller Realty Company note, but the mortgages described land now owned by Candlewood; that Hahn represented to the plaintiff that Candlewood owned the land described in the mortgages; that on February 18, 1975, E. G. Miller Enterprises, Inc., executed a warranty deed to Candlewood that had been prepared by Hahn but which did not describe the property the deed was intended to convey; that Hahn was in direct communication with the plaintiff in regard to these matters, and the plaintiff relied upon the misrepresentations made by Hahn; that the plaintiff does not show whether Hahn knew whether the representations he made to the plaintiff were untrue; that the plaintiff had been damaged because there was a balance of $148,358.60, plus interest, due on the note which the plaintiff was unable to collect because of the misrepresentations of Hahn. There was no allegation that Hahn knew the representations were false and no direct allegation that the representations were made with the intention that they be acted upon.

*Ames Bank v. Hahn,* 205 Neb. at 354–55, 287 N.W.2d at 688–89.

In response, the defendant filed a demurrer to the petition, contending that the plaintiff was required to allege scienter or "an intent to deceive." In addressing this issue, the Nebraska Supreme Court wrote:

The issue with regard to the first cause of action is whether the plaintiff was required to allege scienter or an intent to deceive. In *Page v. Andreasen,* 200 Neb. 641, 264 N.W.2d 682, we said: "The essential elements required to sustain an action for fraudulent misrepresentation are, generally speaking, that a representation was made as a statement of fact, *which was untrue and known to be un-*

*true by the party making it,* or else recklessly made; that it was made with *intent to deceive* and for the purposes of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage." (Emphasis supplied.)

The plaintiff relies on *Campbell v. C & C Motor Co.,* 146 Neb. 721, 21 N.W.2d 427, and contends that it was not required to allege that the misrepresentation was made with intent to deceive. In the *Campbell* case we said: "In this connection, the burden is on the plaintiff to prove by preponderance of the evidence, the following essential elements constituting fraud and deceit: (1) That such defendant made a material representation; (2) that it was false; (3) *that, when made, such defendant knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted on by plaintiff*; (5) that plaintiff acted in reliance on it; and (6) that he thereby suffered injury." (Emphasis supplied.) The requirement of scienter is satisfied by alleging that the person making the statement knew the statement was false, or made it as a positive statement without knowledge as to whether it was true or false, and the false statement was made with intention that it should be acted upon. See, 37 C.J.S., Fraud, § 19, p. 254; Prosser, Law of Torts (4th Ed.), § 107, p. 699, at p. 700.

The first cause of action alleged in this case was defective because the plaintiff failed to allege that the defendant knew the representation was false, or made the representation as a positive statement without knowledge as to whether it was true or false.

*Ames Bank v. Hahn, supra,* 205 Neb. at 355–56, 287 N.W.2d at 689.

■ Reading the *Ames Bank* decision in light of prior Nebraska case law discussed

earlier, it is this Court's opinion that proof of scienter is, indeed, necessary. However, this is *not* scienter in terms of an "intent to deceive." Rather, this is scienter in terms of knowledge and it is satisfied, as *Ames Bank* demonstrates, by proving that the person who made the representation knew it was false or made it as a positive statement without knowledge as to its truth or falsity.

Moreover, this interpretation is completely consistent with and, indeed, supported by those early cases in which the Nebraska courts held that proof of scienter was unnecessary. As those cases demonstrate, the courts therein were referring to scienter in terms of good faith or intent. *See .Paul v. Cameron, supra; Newberg v. Chicago B. & Q. R. R. Co.,* 120 Neb. 171, 231 N.W. 766 (1930); *Field v. Morse,* 54 Neb. 789, 75 N.W. 58 (1898); *Johnson v. Gulich, supra.* However, in listing the essential elements needed to be proved, those courts required the injured party to prove that the person who made the representation "knew it was false or else made it without knowledge as a positive statement of known fact." *Paul v. Cameron, supra,* 127 Neb. at 517, 256 N.W. at 14. *Accord, Peterson v. Schaberg, supra; see also Willard v. Key,* 83 Neb. 850, 120 N.W. 419 (1909). And, it was this same element that was, in essence, adopted and consistently required to be proved as part of the essential elements set forth in both cases at law and in equity, decided thereafter.

■ In sum, proof of scienter is necessary. However, as the case law demonstrates, this is scienter in terms of a knowledge requirement, not in terms of an "intent to deceive," as Unigard contends. Accordingly, it is clear, in light of the foregoing discussion, that the essential elements necessary to prove a cause of action for misrepresentation have, in essence, remained the same. There are no actual differences, as the parties in this case contend.[12] In short, this Court has come full-

---

**12.** In *Willard v. Key, supra,* the defendant, on appeal, presented an argument similar to that presented herein. While an old case, the lan-

guage of the *Willard* court is particularly appropriate to this case:

circle back to the essential elements in the rescission cases presented at the beginning of this discussion. Thus, it is those elements that will be applied herein. To reiterate, they are as follows:

To maintain an action for rescission because of false representations the party seeking such relief must allege and prove what representations were made; that they were false and so known to be by the party charged with making them or else were made without knowledge as a positive statement of known fact; that the party seeking relief believed the representations to be true; and that he relied and acted upon them and was injured thereby.

*Russo v. Williams, supra,* 160 Neb. at 571, 71 N.W.2d at 138.

Having decided upon the essential elements upon which the plaintiffs have the burden of proof, the Court will proceed to a consideration of the merits of plaintiffs' allegations of misrepresentation.

*Discussion*

(a) Status of Guy Carpenter and Company.

■ At the outset, Unigard contends that it cannot be held responsible for the representations contained in the June 19, 1973, solicitation letter from Mr. Cooper of Guy Carpenter and Company to Mr. Sias of Central National, for the reason that at no time was Guy Carpenter and Company acting as an agent for Unigard. However, in light of the facts of this case and the applicable law, this Court cannot agree.

On March 10, 1972, Mr. Seery wrote to Mr. Cooper stating: "We would like Guy Carpenter to negotiate certain reinsuance contracts *for us* . . . ." (Emphasis added) [Ex. # 5]. At his deposition, Mr. Cooper referred to this letter as Guy Carpenter's "formal appointment" to place reinsurance for Unigard [Cooper depo. 18:7–17]. With respect to its effect, he stated: "This letter empowers us to go into the market and do the transaction of business. We sent a copy of this—in fact, Mr. Sias got a copy of this as *our letter to represent the reinsured companies.*" (Emphasis added) [Cooper depo. 19:15–18]. After Guy Carpenter's appointment as reinsurance intermediary, Mr. Cooper, on various occasions sent drafts of underwriting information and treaty wording to Unigard, for its approval [*See* Ex. # 6, # 10, # 12, # 15–17]. Thereafter, Guy Carpenter transmitted the statement of accounts and periodic bills to the plaintiffs [*See* Ex. # 235, # 237–51].

In the recent case of *In re Pritchard & Baird, Inc.,* No. E–75–3202 (D.N.J. March 1,

---

In *Phillips v. Jones,* 12 Neb. 213, 215, 10 N.W. 708, 709, it is said: "And if a party, without knowing whether his statements are true or not, makes an assertion as to any particular matter upon which the other party has relied, the party defrauded in a proper case will be entitled to relief." The principle there announced has been adhered to by this court in every case where that question has been before it. It is true that it was held in *Runge v. Brown,* 23 Neb. 817, 37 N.W. 660, that, in order to permit a recovery for deceit, there must be established, among other things, "the telling of an untruth knowing it to be such." This case only partially stated the rule. It was modified in *Foley v. Holtry,* 43 Neb. 133, 137, 61 N.W. 120, 121, wherein it is said: "A more accurate statement, in view of the later decisions, would be that the defendant must either know that the representations were false, or else they must be made without knowledge as positive statements of known facts." In *Moore v. Scott,* 47 Neb. 346, 350, 66 N.W. 441, 442, it was said: "This court has repudiated the doctrine

that, in order to make out a case of deceit, it must be shown that the defendant knew his representations to be false. * * * But in all of these cases it is either expressly stated or necessarily implied that in order to be actionable the representations must have been made as a positive statement of existing facts." It has also been held that, although scienter is pleaded, it need not be proved; the allegation being considered as surplusage. *Johnson v. Gulick,* 46 Neb. 817, 65 N.W. 883, 50 Am.St.Rep. 629. *Appellant seeks to distinguish our former decisions above cited, and points out wherein the nature of each action was different from the case at bar. It appears that in Johnson v. Gulick, supra, misrepresentation was pleaded in defense, and that Foley v. Holtry, supra, was an action in equity to rescind a contract obtained by deceit; otherwise we fail to see any distinction between the adjudicated cases cited and this one. They are governed by the same principles.*
*Willard v. Key, supra,* 83 Neb. at 852, 120 N.W. at 419.

1979), the court faced this identical question based on a set of facts similar to those presented in this case. In that case, the court held that the reinsurance intermediary was an agent of the reinsured. In this regard, the court wrote in pertinent part:

Here, ESLIC and P & B entered into an agreement whereby P & B would secure reinsurers who would accept reinsurance on terms and conditions set by ESLIC. During all negotiations leading to the acceptance and execution of the treaty ESLIC made all final decisions as to the terms and conditions of the reinsurance treaty, the ceding commissions to be paid and the limits of the treaty. The reinsurance was offered to the reinsurers on a take it or leave it basis. There is no doubt that P & B was acting as ESLIC's agent for the purpose of ceding the reinsurance, as the reinsurers had no right to negotiate terms or conditions and, indeed, their participation in the treaty was subject to the conditions set by ESLIC . . . .

\* \* \* \* \* \*

The contention that P & B acted as a dual agent has no support in the facts before the Court. There is no indication that any of the reinsurers had the right to, or did control any of the actions of P & B; nor did P & B consent to act in any manner subject to the reinsurers control. In the absence of the element of control, no agency relationship can be sustained. *Aetna Insurance Co. v. Glen Falls Insurance Co.*, 453 F.2d 687 (CA 5, 1972). It is the conclusion of this Court that P & B, as the named intermediary in the all risk reinsurance treaty under consideration, not only acted as the agent of ESLIC for the purpose of ceding reinsurance, but acted also as its agent for the receipt and transmission of all premium-loss-contingent commission monies due under the treaty.

*In re Pritchard & Baird, Inc., supra,* slip op. at 14, 17–18.

Given the similarity between the facts of this case and those presented in the *Pritchard & Baird* case, as well as the extensive treatment of the subject by the Court therein, it is this Court's opinion that the decision of the court in the *Pritchard & Baird* case should be controlling herein. Accordingly, this Court holds that at all times material to this case and in all transactions with the plaintiffs relating to the Unigard reinsurance program, Guy Carpenter and Company was acting as an agent of Unigard.

(b) Allen, Miller and Unigard's Excess and Special Risks Department

■ In his June 19, 1973, letter and attachments thereto, inviting the plaintiffs' participation in Unigard's reinsurance program, Mr. Cooper represented to the plaintiffs that the risks they were to reinsure were to be written, booked, serviced and collected for in the "Excess and Special Risks Department" of the Unigard Insurance Company with only the underwriting done by Allen, Miller [Ex. 28]. However, this Court finds that, in reality, Unigard had no Excess and Special Risks Department and the entire operation was performed by Allen, Miller with no day-to-day supervisor or control by Unigard. This finding is based on the following evidence.

With respect to Unigard's Excess and Special Risks Department, Mr. Seery, in his deposition of November 3, 1978 [Ex. # 150A], testified as follows:

Q. The letter which you seen dated June 19, 1973, from Mr. Mike Cooper to Mr. Bob Syas and has attached to it some exhibits which are captioned Excess and Special Risks Department of Unigard Insurance Company. Do you remember that?

A. Yes.

Q. And the Excess and Special Risks Department phrase was used in the correspondence from time to time with reference to Unigard, and are you familiar with that?

A. Yes, I am.

Q. Can you tell me the history of the Excess and Special Risks Department at Unigard? When did it begin?

A. March 15, 1972.

Q. Who was in the department at Unigard?

A. There wasn't any specific department as such in Unigard. In Unigard the Allen, Miller & Associates Excess and Special Risks operation was described as an Excess and Special Risks Department of Unigard, but there was no physical department. It was a part of the overall corporate underwriting unit.

Q. Was there anybody in Unigard that was an employee of Unigard that was considered a part of the Excess and Special Risks Department?

A. No. There was management people. Essentially myself and Justin Lee, Underwriting Vice President, but there wasn't any—wasn't anybody actively working in the Excess and Special Risks Department as such.

[Seery depo. (11/3/78) 9:13–10:14].

From the foregoing testimony, it is clear that Unigard had no Excess and Special Risks Department.

On the other hand, while the "Underwriting Information" made reference to Allen, Miller solely as underwriter, it is clear from a reading of the agency agreement between Unigard and Allen, Miller [Ex. # 13], that Allen, Miller had been given complete control over the operations with no supervision by Unigard. Indeed, in discussing Allen, Miller's status, Mr. Seery stated as follows:

Q. I will ask you if that is a copy of the first agreement that existed between Allen Miller and Unigard?

A. Yes, it is.

Q. How would you describe that? How would you characterize it in the insurance world?

A. We characterized it as an underwriting management agreement.

Q. Would a manager and general agent be a—

A. I know that other people have used that term, although I don't know if it is correct, but other people have used that.

Q. On a broad category you would classify it as a managing general agent or underwriting general agent?

A. Yes.

Q. How do you distinguish managing general agent contract from a—just an agency general contract?

A. A managing general agency contract is much broader in giving power to the agent than a regular agency contract. That is, it gives them the authority to underwrite contracts, as well as produce business and, depending on the type of arrangement, to settle claims and do the accounting and a variety of things that the insurance company would normally itself do as opposed to the agent.

Q. That includes collecting the premiums and—

A. Yes, sir.

Q. And that is what that contract provided in general?

A. Yes, it did.

[Seery depo. (11/3/78) 38:13–39:15].

Q. And Allen Miller had authority to do the underwriting under the agreement; is that right?

A. Yes, they did.

Q. And you really had no control over the underwriting that he did, because you didn't review it in your office at Unigard, did you?

A. We did not.

Q. There was nobody in Unigard's office that second guessed them on underwriting, as it were, by looking over their underwriting?

A. You mean acceptance of risk and that type of thing?

Q. Yes.

A. No.

Q. Under the contract you really had no authority to do that; isn't that right?

A. We had the right to review their records, whatever, in whatever form we chose to.

Q. But not to tell them how to underwrite?

A. No. That's correct.

[Seery depo. (11/3/78) 66:19–67:12].

Q. Actually, Unigard had no right to supervise Allen Miller under its contract anyway; isn't that right?

A. We had a right to review the books and to audit the records and that type of thing.

Q. But, no right to supervise the day to day operations or the underwriting as it proceeded from day to day; is that correct?

A. That's correct.

[Seery depo. (11/3/78) 83:16–23].

At trial, Mr. Seery again admitted that the agreement between Allen, Miller and Unigard was a managing general agency [Tr. 368:10–17]. As noted earlier, a managing general agent is recognized as one with unlimited authority to underwrite, to appoint other agents, to produce business, to collect the premiums and to service claims [Tr. 69:11–15; 76:5–8; 105:23–106:3; Seery depo. (11/3/78) 39:2–13]. Thus, while Allen, Miller was a managing general agent with unlimited autonomy and control, the sole reference to Allen, Millers functions in the material sent by Mr. Cooper was that Allen, Miller would perform the underwriting [Ex. # 13].

At trial, George E. Young, an expert in the reinsurance field [Tr. 301:20–303:19], was asked to consider the June 19, 1973, letter and the contents contained therein. With respect to the Cooper letter, which Mr. Young described as an offering letter [Tr. 304:12–14], he found that it did not comply with the custom and practice in the insurance industry in that it did not clearly and fully communicate the role and scope of Allen, Miller as Unigard's managing general agent [Tr. 309:17–311:4]. Further, Mr. Young testified that it was custom and practice in the business with respect to the cover or placement slips and treaties, that the Underwriting Manager would be named therein and the documents would be written to reveal that the business was produced under his control. With respect to the placement slips attached to the Cooper letter, Mr. Young found that they, like the

Cooper cover letter, were contrary to custom and practice in the industry. The slips revealed nothing of the nature of Allen, Miller's exclusive responsibility for the management of the business to be insured thereunder, failing to even name that entity [Tr. 311:9–312:5; see Tr. 343:22–346:3].

Likewise, Dennis Gentry, at one time an employee at Central National [Tr. 133:11–14], in outlining his background in the reinsurance business, testified that while he worked for a managing general agency in Texas all reinsurance treaties covering business generated by his employer specifically named such managing general agent as the producer of such business [Tr. 134:2–135:1].

In short, the foregoing discussion makes clear that, with respect to Unigard's Excess and Special Risks Department and the status of Allen, Miller, the representations contained in the Cooper letter and the attachments thereto did not comply with the custom and practice of the business and, most significantly, were totally false. Unigard clearly had no Excess and Special Risks Department. Allen, Miller, on the other hand, had complete control over the operation and no supervision by Unigard. Yet, the sole reference to Allen, Miller in the mass of materials from Mr. Cooper was in the underwriting information that Allen, Miller would perform the underwriting. As Mr. Young testified, this was not in compliance with the custom and practice of the industry and, as the representation did not show the true nature of Allen, Miller's status, it was therefore false.

It is also clear that Unigard knew these representations to be false. The agency agreement between Unigard and Allen, Miller was negotiated in late 1971 to early 1972. It became effective as of March 15, 1972 [Ex. # 13; Tr. 367:9–368:13]. From Mr. Seery's deposition, it is clear that at all times Unigard knew that there was no actual Excess and Special Risks Department.

On May 25, 1972, Mr. Cooper wrote Mr. Seery, enclosing a draft of the Excess Property Treaty. In this letter, Mr. Cooper also wrote in pertinent part:

The two *major points* upon which we should appreciate your guidance, both as respects this Cover and the Excess Liability Covers, are:

\* \* \* \* \* \*

2) In line with the placing slips and our Cover Notes, Article 1 does not mention Allen, Miller and Associates, Inc. As such, the contracts are technically broader, although the memorandum of underwriting information sent to all Reinsurers states that underwriting will be performed by Allen, Miller. Perhaps it is in order to use the language in the draft, which would mean that no contract amendment would be necessary should you at some future date appoint other Underwriting Managers in different areas of the country. Pending your reply to the second point in particular, we have not sent a copy of the draft to Bill Allen. (Emphasis added). [Ex. # 10].

On June 8, 1972, Mr. Cooper and Mr. Seery met to discuss the wording of the Treaty and the "major points" raised in Mr. Cooper's letter of May 25, 1972 [Ex. # 12]. Thereafter, on June 20, 1972, Mr. Seery wrote Mr. Cooper confirming their June 8 conversation. In this letter he wrote:

We discussed your cover wording and your letter of May 25, 1972 when I was in your office June 8th. I indicated in that conversation that the wording as outlined was acceptable to us.

[Ex. # 12]. Thus, by these letters, it is clear that Guy Carpenter and Unigard had agreed not to mention Allen, Miller's name or role in these reinsurance transactions.

Yet, in light of experience that Unigard and Guy Carpenter had in this business [Tr. 365:15–16; 340:17–25], it can safely be assumed that they knew that custom and practice in the industry dictated that Allen, Miller's name and its role be spelled out in the materials sent to Central National and the treaties which would be drafted thereafter. Indeed, absent such a custom, why would Mr. Cooper, in requesting authority from Mr. Seery to omit Allen, Miller's name, term it a "major point" and then, when authority was orally granted, again request that it be verified in writing? [Ex. # 10 and # 12]. This Court can only conclude that Mr. Cooper knew that this action was a major departure from accepted custom and practice and was being careful to see that it was duly agreed to by Unigard.

Moreover, Unigard's explanation that Allen, Miller's name was omitted so Unigard could appoint other managing agents without rewriting the treaties only emphasizes the importance of the custom and practice that when a managing general agent is being relied upon, its name and rule must be stated. In the absence of such a custom, Unigard could, as it did in this case, make no mention of a managing general agent in the contract and then, at any time, select other managing agents about which the reinsurers would know nothing and the qualifications of which they would have no right to pass on. Surely, no reinsurer would knowingly expose itself to that hazard. Hence, there is the trade and custom of naming the managing general agent in the treaty.

In short, although Unigard knew the custom and practice of the industry, knew it had omitted Allen, Miller's name, knew as of March 15, 1972, what Allen, Miller's role was in the operation, and knew it had no Excess and Special Risks Department, in the material sent on June 19, 1973, to Central National, it falsely represented that it had an Excess and Special Risks Department and, on one line among a mass of materials, that Allen, Miller was merely the underwriter. Obviously, from the evidence in this case, Unigard had knowledge that these representations were false.

At trial, Robert Sias, to whom the Cooper letter and the treaties were tendered, testified that over a span of approximately forty-three years he had received many proposals for reinsuring business generated by managing general agents but had never included a managing general agency treaty in his portfolio [Tr. 94:4–7; 106:20–107:15]. He testified that at the time he committed the plaintiffs to the subject treaties he was

under the impression "from telephone conversations, et cetera, that this was a special risk division of the Unigard Insurance Company under their management, supervision and control, and that Allen, Miller's references were strictly to underwriting functions which I assumed would be under that management and control ...." [Tr. 108:18–109:3]. Mr. Sias further testified that if he had known that the Allen, Miller agency was a completely independent managing general agent not subject to day-to-day review by Unigard, he would not have accepted this reinsurance business [Tr. 109:5–17].

On or about June 28, 1973, Mr. Sias, on behalf of the plaintiffs, executed the various placement slips included with the Cooper letter of June 19, 1973, by which the plaintiffs agreed to accept and reinsure certain risks of Unigard [Ex. #28; Filing #66 at ¶ 6].

Thus, from the foregoing discussion, it is clear that the false representations contained in the letter of June 19, 1973, were believed by Mr. Sias to be true, were material to his decision to execute these treaties on behalf of his principals, were relied upon in executing the treaties, and, therefore, induced Mr. Sias to do so.

Finally, it is clear from the evidence that the plaintiffs were damaged by these false representations. When the plaintiffs entered into these treaties in reliance on the representations in the Cooper letter, they elected to accept 5% and later 7 ½% of the business written [Tr. 99:14–100:9; Ex. #32 and # 34]. However, by reason of the complete control that Allen, Miller had over the operations, as will be discussed in the next section, premium volume increased drastically [see Ex. # 48; see also Ex. #258; Defendant's answers to interrogatories No. 1 and 6]. Consequently, plaintiffs were damaged by being exposed to a much greater volume of loss than they anticipated [see Tr. 112:12–113:10; Ex. # 48].

In sum, the evidence is clear that in his letter of June 19, 1973, Mr. Cooper, on behalf of Unigard, made representations concerning Unigard's Excess and Special Risks Department and Allen, Miller's status; that these representations were false and so known by Unigard; that the plaintiff believed the representations to be true; and that they relied upon them and were injured thereby.

(c) Premium Volume and the Unearned Premium Portfolio Transfer of July 1, 1973

█ In the experience figures accompanying the June 19, 1973, letter, Mr. Cooper, on behalf of Unigard, represented written premium for the period April 1, 1972 to March 31, 1973, to be $6,149,025.00 and earned premium for the same period to be $3,264,586.00, thereby leaving an unearned premium portfolio of $2,884.439.00 to be assumed by the reinsurers on July 1, 1973 [Ex. #28; see also Tr. 111:22–112:11]. However, as the following discussion will clearly show, these representations, like the representations discussed in the prior section, were false.

It now appears from the most recent figures that the amount of the unearned premium portfolio transfer on July 1, 1973, was $18,229,011.88 and the premium volume for the period April 1, 1972 to June 30, 1973, was $26,462,729.08 [Ex. # 258, Defendant's answers to Interrogatories Nos. 1 and 6]. Clearly, a comparison between these figures and the original figures set forth on June 19, 1973, demonstrates that the latter were falsely represented.

Indeed, in discussing these discrepancies, Mr. Young testified:

Q. Is the dollar amount of the premiums in force on that particular date what is referred to as the unearned premium portfolio at July 1st, 1973?

A. Yes.

Q. Can you determine from the information contained in Exhibit 28 anything with reference to the unearned premium portfolio?

A. Yes, you would—in the experience exhibit it reports total written premium from April 1, '72 to March 31, '73, as being $6,149,025.00. It shows the unearned premium for that period of time to be $3,264,586.00, so

with the unearned premium portfolio at that date would have been the three million-two-six-four subtracted from six million one-forty-nine, or something under $3,000,000.00.

Q. And that would be as of March 31st, 1973—is that correct?

A. That's correct.

Q. I would like you to assume that a reinsurer enters into the treaties tendered with Exhibit 28, and assume further that he receives the following reports of the size of the June 30th, 1973, portfolio transfer—

MR. MATTHEWS: May I approach the chart?

THE COURT: You may.

Q. (Continuing) On October 15th, 1973, $3,564,348.00; on March 8th, 1974, $8,482,097.00; on July 12th, 1974, $8,394,511.00; on April 11th, 1975, $9,915,957; and on November 6th, 1975, $17,133,845.00. Do you have an opinion as to whether a presentation letter such as Exhibit 28 would be giving accurate information as to the amount of the unearned premium which was to be assumed under the treaties tendered by such a presentation letter.

\* \* \* \* \* \*

A. Well, before there could be constant amendments in the figures that are presented for that unearned premium transfer, it's—I just can't understand that at all. Unearned premium should be a rather precise determinable figure unlike outstanding loss reserves which are subject to greater variations, but unearned premium should be a mathematically determinable figure, and for it to be presented as three million here and eighteen million two years later, I just can't understand.

Q. Now I would like you to assume that the volume is recorded, the volume of premium written is recorded in a presentation letter such as Exhibit 28 for a twelve-month period ending on

March 31st, 1973, to be $6,149,025.00, and assume that it is later determined that the volume of premiums written during the fifteen months ending on June 30th, 1973, was $26,355,389.00. Do you have an opinion as to whether such a presentation accurately — would accurately describe the volume written during the twelve months ending on March 31st, 1973?

\* \* \* \* \* \*

A. Yes.

Q. And what is that opinion?

A. For a figure of six million to be presented for a twelve-month period and then years later to be determined that it's twenty-six million is certainly misleading to the reinsurer, the potential reinsurer.

Q. Do you have an opinion as to whether it would be possible for a producer to write $26,000,000.00 in premium buying during the fifteen-month period ending June 30, 1973, and that in June the reported volume written of $6,149,025.00 for the twelve months ending March 31st, 1973, and on September 15th of 1973 to report the unearned premium as of June 30th, 1973, to be $3,564,328.00, and to not know that these reports were grossly inaccurate?

\* \* \* \* \* \*

A. Yes.

Q. What is that opinion.

\* \* \* \* \* \*

A. Well, anybody producing this business should have a pretty good idea of how much has actually been written in a certain period of time. I suppose you could not expect him to be right on the button, but for there to be a discrepancy of two, three, four hundred per cent seems completely unreasonable and not to be expected.

[Tr. 312:16–318:2].

It is also this Court's opinion that Unigard had knowledge that these figures were false.

At trial, Mr. Seery testified that he had not seen Mr. Cooper's letter of June 19, 1973 [Tr. 388:9–11]. However, in his deposition, Mr. Cooper testified that he submitted the figures to Mr. Seery for approval before sending them to Mr. Sias [Cooper depo. 83:10–84:20]. Also, on June 22, 1973, Mr. Cooper sent Mr. Seery a copy "of the letter we have sent to Reinsurers . . . together with copies of experience exhibits." [Ex. #29]. At the bottom of this letter, Mr. Cooper stated: "P.S. Copy of memorandum of underwriting information also enclosed." Thus, it is clear that Mr. Seery was then aware of all of the material supplied by Mr. Cooper to Mr. Sias on June 19, 1973 [see also Cooper depo. 89:11–90:10].

In his deposition of September 26, 1979, Mr. Seery testified that the Allen, Miller "gross premium written which applied to both quota share and excess of loss treaties was $26,355,389" for the period prior to July 1, 1973, according to Unigard's report as of March 31, 1979 [Seery depo. (9/26/79) 22:24–23:11]. As was previously noted, Mr. Cooper's letter of June 19, 1973, to Mr. Sias, forwarding the figures approved by Mr. Seery, included experience sheets showing said volume prior to March 31, 1973 to total $6,149,025.00 [Ex. #28]. In attempting to explain this discrepancy, Mr. Seery testified that "the major dollar reason" for the difference between the two figures

> was basically late reporting, because of the paper work. They started out with six people. They were, I would say, more successful than they anticipated being and there was a tremendous amount of unrecorded daily reports just not process through the office.

[Seery depo. (11/3/78) 19:11–17]. He added that:

> The second reason was a technical reason. Unigard's first financial audit of them, which would have been in—started in February or March of 1973 and ended in, I think, late July of '73, we discovered that their chief accounting—chief accountant was recording premiums on a

cash collected basis as opposed to a written basis.

[Seery depo. (11/3/78) 19:18–24].

However, as early as May 3, 1973, Mr. Seery received a memo from William Rieck, Senior Accountant at Unigard [Rieck depo. 4:708], calling Mr. Seery's attention to the concern of Unigard's accounting department "regarding Allen, Miller's method of recording direct premiums only when cash is received instead of when the policies are written." [Ex. #24]. As Mr. Rieck testified in his deposition, "[n]ormally you would record premiums on the basis of the amount written at the point it is written." [Rieck depo. 6:11–18]. On May 21, 1973, Mr. Seery received a follow-up memo on the same subject [Ex. #25]. On May 23, 1973, Mr. Seery wrote to Mr. Rieck, stating: "I discussed directly with John Miller and Bill Allen their apparent method of recording direct premiums only when the cash is received instead of when the policies are written. They verify that such is the case." All this preceded June 19, 1973, the date on which the plaintiffs were asked to participate in Unigard's reinsurance program.

On June 19, 1973, the figures, as approved by Mr. Seery, were presented to the plaintiffs as accurate and final. Yet, on July 7, 1973, Mr. Seery wrote J. D. Jorgenson, his superior at Unigard, stating: "It has now become incumbent upon Allen, Miller & Associates to get the accounts up to date as of the quarter ending June 30, 1973, on an accrual basis." [Ex. #30].

Thereafter, on July 26, 1973, Mr. Seery wrote Mr. Allen, advising him, as he indicates in this letter he did as early as *May 3, 1973*, that henceforth his reports should include all business "written." [Ex. #35]. With respect to this letter, Mr. Seery testified:

Q. Mr. Seery, I have handed you or had the reporter hand you Exhibit 38 which appears to be a letter from you to Mr. Allen dated July 26, 1973, and you may read the whole letter if you want to, but there are only a few paragraphs I'm going to ask you about, so I will just go to those to save time.

First, on the first page in the second paragraph near the end of the paragraph you make reference to, "the very large volume itself dictates that we must be on a correct statutory reporting basis immediately." Do you recall at that time what you had in mind as a very large volume that they were writing?

A. No. In terms of dollars?

Q. Yes.

A. I don't recall now, no.

Q. Presumably you were receiving reports which Mr. Cooper forwarded to Mr. Sias with respect to volume. Would that be in the neighborhood of those figures that you were thinking of at that time?

A. I would say greater.

Q. Probably greater because you also had reports on facultative that he didn't have or what would be the reason?

A. That would be one of the reasons. *We also at that time had cash collected as opposed to premiums written.*

Q. *But you knew then he was not up to date? That is what, in effect, you were asking him to do, to give you correct statutory reporting?*

A. *That is correct.* (Emphasis added). [Seery depo.(9/26/79) 49:14–50:19].

Thus, from the foregoing discussion, it is clear that Unigard had knowledge of the fact that on June 19, 1973, Allen, Miller was reporting premiums as written and that it was behind on its accounting. In light of this, it is apparent that Unigard knew that the figures submitted to Mr. Sias with the tender letter were false, notwithstanding that it relayed the information to the plaintiffs as completely correct to induce the plaintiffs' participation in Unigard's reinsurance program.

With respect to the difference between the figures as represented in the experience figures attached to the June 19, 1973, letter and figures as eventually reported, Mr. Sias, at trial testified that if had known the premium volume generated by the Unigard operation during its first fifteen months of operation was $26,335,389.00 instead of $6,149,025.00, as represented to him, he would have been apprehensive and, at the very least, "would have materially reduced (his) line." [Tr. 110:6–111:15]. Again, with reference to the unearned premium portfolio transfer, which was represented to be $2,884,439.00, whereas it was, in fact, $17,247,068.00 [Ex. #242], Mr. Sias testified that had he known the true size of such portfolio he would at the very least have accepted a smaller portion of the business, if not rejected it in its entirety [Tr. 112:12–114:25].

In short, the evidence is clear that Central National believed the original figures to be true and elected to accept a certain percentage of the business on the basis of such figures.

Lastly, as the Court noted earlier in its discussion of Unigard's representations regarding Allen, Miller and Unigard's Excess and Special Risks Department, it is clear that the plaintiffs, by relying upon these figures, were damaged. By reason of the massive generation of volume which was unreported at the outset of these transactions, the plaintiffs were exposed to much greater risk and ultimately a greater volume of loss.

The evidence makes clear that Unigard represented that the figures contained in the experience figures attached to the June 19, 1973, letter were actual and accurate when, in fact, Unigard knew they were not, that the plaintiffs elected to accept a percentage of the business on the basis of such figures and that the plaintiffs were damaged by exposure to a much greater volume of loss than would have been possible had the figures originally quoted been correct.

(d) All Risk Treaty

As noted previously, in this action Unigard counterclaimed, seeking certain sums of money alleged as due under the four treaties sued on by the plaintiffs and an additional sum of money under a fifth treaty, the All Risk Treaty. In response, the plaintiffs, as they did with respect to the

four treaties, raised various misrepresentations made by Unigard at the inception of the All Risk Treaty. This Court is of the opinion that the above discussion regarding the other four treaties is equally applicable to the All Risk Treaty and need not be reiterated here. However, the Court will briefly review the circumstances peculiar to this treaty to demonstrate its similarity to the other treaties.

As noted earlier, on May 17, 1973, Mr. Kelley, of Pritchard & Baird, wrote Mr. Sias, inviting Central National's participation on the All Risk Treaty. The cover letter was captioned:

UNIGARD MUTUAL INSURANCE COMPANY
for the account
Allen, Miller Associates

At the bottom of this letter, Mr. Kelley wrote: Unigard is making its mark in the excess and surplus lines field. We have good reason to believe the growth pattern will be solid and consistent with Unigard's performance in the past." In a memorandum attached to the cover letter were similar captions and at the end of the memorandum there was various information regarding the employees of Allen, Miller [Ex. # 263].

However, as Mr. Sias testified at trial, nowhere in this material is it stated that Allen, Miller was managing general agent for Unigard, nor was there anything contained therein to indicate that such was the case [Tr. 97:8–98:4]. Moreover, with respect to the words "for the Account of", Mr. Walters testified that the phrase generally refers to an agent; the phrase does not designate whether it is an agent or a managing general agent [Tr. 242:25–243:8]. As the Court noted earlier, there is a vast difference between the responsibilities of the two types of agents. Thus, it is clear that Unigard, like it did with the other four treaties, misrepresented the status of Allen, Miller in attempting to obtain the plaintiffs' participation on the All Risk Treaty.

The Court is also of the opinion that Unigard, as it did with the other treaties, misrepresented the amount of the unearned premium portfolio to be assumed by the plaintiffs under this treaty.

The Pritchard & Baird presentation letter tendering the treaty stated that the business written the first year, the unearned part of which was to be assumed by plaintiffs as a portfolio transfer, totalled $338,-705.00 [Ex. # 263]. However, on March 31, 1979, Unigard revealed the first year's unearned premium portfolio to total in excess of $2,033,670.69 [see Filing # 45, Ex. C]. Obviously, from this, it is clear that Unigard grossly understated the first year's unearned premium portfolio under the All Risk Treaty.

In sum, this Court finds that its discussion regarding Unigard's misrepresentations of the status of Allen, Miller and the unearned premium portfolio in soliciting the plaintiff's participation in the Quota Share and Excess Layered Treaties is equally applicable to the circumstances surrounding the All Risk Treaty. As the evidence makes apparent, Unigard, likewise, misrepresented the status of Allen, Miller and the amount of the unearned premium portfolio in attempting to obtain the plaintiff's participation in this treaty.

### RESCISSION—NONPERFORMANCE

The plaintiffs also claim they are entitled to rescission on the basis that Unigard failed to perform as required under the treaties. While plaintiffs' allegations of misrepresentation in themselves form the basis of a claim for rescission, nevertheless, the Court believes that a discussion of plaintiffs' claim of nonperformance is warranted in that this claim is interrelated with plaintiffs' misrepresentation allegations and adds further impetus to its claim for rescission.

*Applicable Law*

In *Klapka v. Shrauger*, 135 Neb. 354, 281 N.W. 612 (1938), the Nebraska Supreme Court set forth those principles of law which govern an action for rescission on the basis of breach of contract or failure to perform. The *Klapka* court wrote as follows:

It is not every breach of a contract or failure exactly to perform—certainly not every partial failure to perform—that entitles the other party to rescind. A breach which goes to only a part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom. A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. 12 Am.Jur. 1020, sec. 440. See *Schlake v. Healey*, 108 Neb. 35, 187 N.W. 427.

*Klapka v. Shrauger*, 135 Neb. at 361, 281 N.W. at 616.

Likewise, in *Olson v. Pedersen*, 194 Neb. 159, 231 N.W.2d 310 (1975), the Nebraska court recently wrote: "... where a breach is so material and substantial as to defeat the objects of the parties in making the contract, forfeiture or rescission may be declared." *Olson v. Pedersen*, 194 Neb. at 165, 231 N.W. at 315.

This Court will now proceed to apply the above principles to the evidence presented herein.

*Discussion*

■ The plaintiffs contend that Unigard materially breached the agreements by reason of its failure to render timely and accurate reports and its failure to keep accurate records. Under these circumstances, they claim that rescission is warranted.

Under the cover slips and treaties covering the Casualty Excess First and Third Layer, it is provided that quarterly reports shall be rendered by the reinsured "as soon as practicable" following the close of each quarter and "premiums shall be paid promptly following the close of the quarter accounted for." [Ex. #253A and #254A]. The cover slips and the treaties covering the Excess Property and the Quota Share provide that the company shall provide quarterly reports as soon as practicable "but not

exceeding sixty (60) days after the close of each quarter" and that the balances due thereunder shall be paid "within sixty (60) days after the close of each quarter." [Ex. #252A and #255A]. However, at trial, it was indicated that, at times, it was industry practice to allow up to a maximum limit of 120 days to report [Tr. 326:5–20; 72:3–73:4].

With respect to the accuracy of record-keeping, the Property Excess Treaty specifically provides that "[t]he Company shall maintain the appropriate records of all policies reinsured hereunder and premiums transactions related thereto." [Ex. #255A].

The evidence in this case makes clear that Unigard failed to render timely and accurate reports to the plaintiffs. As noted previously, Unigard did not submit any report to the plaintiffs within sixty days of the close of the second quarter 1973 other than a letter dated September 25, 1973, from Guy Carpenter and Company reporting the July 1, 1973, unearned premium portfolio transfer to be $3,564,348.87 [Ex. #41]. Two years later, on November 6, 1975, Unigard reported to the plaintiffs for the first time that the unearned premium portfolio at July 1, 1973, was $17,133,845.09 [Ex. #242]. Intervening reports had been submitted showing substantially smaller amounts [Ex. #235, #237–41; *see also* Ex. #270].

A review of these reports indicates that virtually all were rendered beyond the sixty day reporting period and that some were even rendered outside the maximum reporting period of 120 days [*see* Ex. #235, #237–42; *see also* Ex. #270]. Moreover, in light of the amounts reported in November of 1975, it is obvious that the reports rendered prior thereto, showing substantially smaller amounts, were erroneous. Thus, Unigard essentially did not submit a reasonably accurate report on the July 1, 1973, unearned premium portfolio until November of 1975, approximately two years after it was due [*Compare* Ex. #41 *with* Ex. #242].

It is also clear that Unigard failed to keep accurate records.

As noted above, the Excess Property Treaty provided that Unigard keep accurate records [Ex. # 255A]. Unigard kept no records but delegated that duty to Allen, Miller [see Ex. #13]. Allen, Miller failed to render accountings on time [Seery depo. (11/3/78) 87:6–7], failed to maintain files [Seery depo. (11/3/78) 88:11–12], failed to make timely demands for premiums and failed to collect premiums [Seery depo. (11/3/78) 88:20–22]. Indeed, the evidence indicates that over all, Unigard and its managing general agent, Allen, Miller failed to keep adequate records [Jorgenson depo. 9:20–21; 29:7–23; 35:16; 36:23; 50:21–51:11; Sias depo. 5:7–9; 6:11–16; 10:23–11:4; Ex. #209].

It is clear that Unigard breached the agreements by its failure to keep accurate records. Moreover, it is clear that these actions constitute a material and substantial breach of the agreements.

At trial, Mr. Young testified that the requirement of timely and accurate reports, as well as the prompt payment of premiums, is an essential element of the terms of a reinsurance contract [Tr. 319:5–9; 319:15–18; 322:11–14]. As Mr. Young indicated, the rendition of reports has a serious impact on the reinsurer's investment income and future investment decisions and its decision to increase or reduce its involvement in the program or terminate it in its entirety [Tr. 319:11–14; 319:20–320:11; see also Tr. 71:15–72:2]. Indeed, Mr. Young testified that inaccurate reports are worse than no reports at all. As Mr. Young indicated, when a report is received, the reinsurer assumes that it is accurate and has been prepared in conformance with the terms of the agreement. If the report subsequently turns out to be incorrect, the reinsurer is unable to take corrective measures. On the other hand, if no report is received, the reinsurer is on notice that something is wrong and can take corrective action, such as terminating its involvement in the business [Tr. 321:12–322:3; 326:21–327:10].

In this case, as was noted above, Unigard continually rendered inaccurate and, at times, untimely reports. Unigard also failed to keep proper records and promptly pay premiums due the plaintiffs [see Ex. #241]. As a result, the plaintiffs accepted business they would not have otherwise accepted [see Tr. 111:13–15; 113:6–10], continued on contracts they would otherwise have terminated [Tr. 142:24–143:7], were denied earnings on policy reserves they were entitled to, and, as discussed earlier in this opinion, suffered losses they would otherwise have avoided. Under these circumstances, it is this Court's opinion that Unigard's failure to perform in accordance with the terms of these agreements constituted a material and substantial breach of said agreements.

## RATIFICATION, WAIVER AND STATUTE OF LIMITATIONS

Having found that Unigard made various misrepresentations at the inception of these agreements and materially breached the terms of these agreements does not necessarily end this Court's determination herein. It now becomes necessary to consider Unigard's contention that the plaintiffs' claim for rescission is barred by the doctrines of ratification and waiver and the applicable statute of limitations.

### Ratification—Waiver

Essentially, it is Unigard's position that the plaintiffs were aware of the exact extent of the premium volume approximately two years prior to filing this lawsuit in November of 1975, the date they received the First and Second Quarter 1975 reports [Ex. #242] and that their conduct thereafter constitutes a ratification and waiver of Unigard's misrepresentations. Accordingly, Unigard contends that plaintiffs are barred from rescinding these agreements [see Filing # 62].

### (a) Applicable Law

In *Russo v. Williams, supra,* the Nebraska Supreme Court set forth the law applicable to the matters raised herein:

"Whether the right of one party to a contract to rescind the same arises on account of fraud inducing the contract or

on account of a breach by the other party of a dependent covenant, such right is barred by failure of the one party, for an unreasonable time after knowledge of the facts giving rise to such right, to declare a rescission and disclaim the benefits of the contract." *Platner v. Ellingwood,* 123 Neb. 719, 243 N.W. 896. See, also, *Sipola v. Winship,* supra [74 N.H. 240, 66 A. 962]; *Rayburn v. Norton,* supra [117 Or. 328, 243 P. 560]; *Rasmussen v. Hungerford Potato Growers Ass'n,* 111 Neb. 58, 195 N.W. 469.

\*    \*    \*    \*    \*    \*

The question whether laches exists in a particular case depends upon its own peculiar circumstances and is addressed to the sound discretion of the court, the question of the unreasonableness of the delay depending largely upon the nature of the property in the particular case." 66 C.J., Vendor and Purchaser, § 477, p. 825.

*Russo v. Williams, supra,* 160 Neb. at 582, 582–83, 71 N.W.2d at 143, 144. *Accord, Mazanec v. Lincoln Bonding and Ins. Co.,* 169 Neb. 629, 100 N.W.2d 881 (1960); *Wegner v. West, supra, Caruso v. Moy, supra.*

In *Mazanec,* the Court, after quoting the principles set forth in *Russo,* continued:

Also, as early as *Ensign v. Citizens' Interurban Ry. Co.,* 92 Neb. 363, 138 N.W. 718, 721, this court said: " 'It is a principle which has been too long and too thoroughly established in our law to admit of any doubt or discussion either as to the principle itself, or the reasons upon which it is founded, that a party claiming to rescind a contract on the ground of fraud must do so promptly upon discovery of the facts, and that if he delays, or takes any further steps in the execution of the contract, or does any act recognizing its validity, after discovery he loses all right to this particular form of relief.'

"In the case of *Grymes v. Sanders,* 93 U.S. 55, 23 L.Ed. 798, it was held: 'Where a party desires to rescind upon the ground of mistake or fraud, he must, upon discovery of the facts, at once announce his purpose and adhere to it.'

The same doctrine was announced by this court in the case of *American Building & Loan Ass'n v. Rainbolt,* 48 Neb. 434, 67 N.W. 493." See, also, the many authorities cited and discussed for this and other jurisdictions in Annotation, 72 A.L.R. at pages 726 to 797 inclusive.

Further, in *Hollenbeck v. Guardian Nat. Life Ins. Co.,* 144 Neb. 684, 14 N.W.2d 330, 331, this court held: "Where one is put upon inquiry, he is charged with notice of all of such facts as he would have learned by reasonable inquiry." See, also, *Durfee v. Keiffer,* 168 Neb. 272, 95 N.W.2d 618.

*Mazanec v. Lincoln Bonding and Ins. Co., supra,* 169 Neb. at 645–46, 100 N.W.2d at 891.

■ In short, the case law makes clear that a party's right to rescind a contract may be barred, if after an unreasonable time after knowledge of the facts giving rise to the right, the party fails to declare a rescission and disclaim the benefits of the contract.

■ However, the case law also makes clear that the "knowledge" necessary to give rise to the right must be *full knowledge.* See *Wegner v. West, supra,* 169 Neb. at 552, 100 N.W.2d at 547; *see also Southern Surety Co. v. Fidelity & Cas. Co.,* 50 F.2d 16, 19 (8th Cir. 1931); *Darque v. Chaput,* 166 Neb. 69, 88 N.W.2d 148, 158 (1958). Indeed, in *Foley v. Holtrey,* 43 Neb. 133, 61 N.W. 120 (1894), the Nebraska Supreme Court held that a party seeking rescission was not compelled to begin his action or even notify the other party of his intent to rescind, the moment he was in possession of information sufficient to arouse his suspicion or sufficient even to impose upon him the duty of investigating and ascertaining the facts. "It was sufficient if, after being put upon inquiry, he proceeded with reasonable promptness to ascertain the facts." *Foley v. Holtrey, supra,* 43 Neb. at 144, 61 N.W. at 124.

■ Applying the above principles to the evidence adduced in this case convinces the Court that the plaintiffs' claim for re-

scission is not barred by ratification or waiver.

(b) Discussion

1. Premium Volume and Unearned Premium Portfolio Transfer

At the beginning of 1974, when the reports did not appear on schedule, the plaintiffs considered issuing notice of cancellation of the contract. Mr. Gentry, of Central National's reinsurance department, made a special trip to the west coast to discuss the situation with Unigard's representative. At that time, Mr. Gentry was assured that all was well and thus was persuaded not to send a 90-day notice of termination as of June 30, 1974, as he had intended [Tr. 135:25–142:23].

Around this same period of time, a confidential office memorandum was sent from Mr. Seery to Mr. J. D. Porter, President of Unigard, indicating that Allen, Miller was producing more volume that expected, indulging in rate cutting, and was accepting business from questionable sources [Ex. # 48]. The memorandum further indicated that Unigard could not "monitor the operation closely enough on a long range basis to stay out of troublesome complications of the type that [had] plagued [Unigard] continuously." [Ex. # 48 at 7]. At the end of the memorandum, it stated that those in charge of the operation had concluded that "effective immediately we should 'step down' our involvement with the Allen, Miller organization with the goal of completely severing connections by mid-year of 1974. . . . We must attempt to do it in a fashion that will avoid . . . an announcement . . . that we [have] 'cancelled' Allen, Miller." [Ex. # 48 at 7]. Thereafter, the Executive Committee of Unigard met and agreed to take the action proposed by Mr. Seery in his memorandum [Ex. # 49; *see also* Ex. # 50 and # 51].

However, the contents of this memorandum were never made known to the plaintiffs, nor was this information passed on to Mr. Gentry during his visit to the west coast around that same period of time [Tr. 139:14–142:10]. Consequen'ly, as Mr. Gen-

try testified, the plaintiffs were persuaded to continue on the reinsurance treaties rather than sending the June 30 cancellation notice [Tr. 142:11–143:7].

Thereafter, in September of 1974, Mr. Gentry was informed by Mr. Cooper that Unigard was terminating its relationship with Allen, Miller, effective October 15, 1974. As a result, Mr. Gentry believed that it was imperative that the plaintiffs also issue a notice of cancellation of the treaties between them and Unigard [Tr. 145:20–146:6]. Accordingly, on September 27, 1974, the plaintiffs sent notices of termination [Ex. # 75, A, B, C; Tr. 146:7–11]. At that time, the most recent information in plaintiffs' possession was that contained in Unigard's report for the first quarter of 1974. This report showed a July 1, 1973, unearned premium portfolio transfer as only $8,394,511.00.

Thus, it is obvious that prior to and at the time the plaintiffs sent their notice of termination they were not fully informed of the situation and had not waived their right of rescission. Thereafter, the plaintiffs constantly sought to obtain accurate and reliable figures.

In November of 1975, more than a year after the treaties had been cancelled, the plaintiffs received the First Quarter 1975 report. This was the first report to indicate the full extent of the July 1, 1973, unearned premium portfolio [Ex. # 242]. The $17,133,845.00 amount shown was approximately $7,000,000.00 greater than the amounts determinable through the prior Fourth Quarter 1974 report received in the preceding May [Ex. # 241]. In addition, the cumulative amount of premiums written increased drastically by over $10,000,000.00. Apparently, this was due to the fact that Unigard, during the summer of 1975, had taken over Allen, Miller's records and began to compile and issue the reports itself. It was this same report that showed for the first time that Unigard charged plaintiffs a 27.5% commission on the premiums that went not to the plaintiffs but to the excess reinsurers [*see* Ex. # 242, # 241 and

# 240]. It was also this report that, for the first time, showed cumulative volume figures from inception to date [Ex. # 270].

Thereafter, the plaintiffs took numerous actions which, upon review, clearly cannot be said to constitute a waiver or ratification on their part of their right to rescind.

In December of 1975, Mr. Walters, the controller of Central National, was advised by his reinsurance department that the figures in the reports received in November of that year were "absolutely incorrect" [Ex. # 230]. The action he immediately took was to order a hold on transactions with Unigard. He instructed his department to make no more payments on the accounts rendered by Unigard [Ex. # 230; Tr. 236:2–10; 237:23–238:2].

Thereafter, representatives of the plaintiffs began communicating with various representatives of Unigard in an attempt to uncover and clarify problems and settle the situation. In March of 1975, Mr. Gentry, representing Central National, wrote James Amon, representing Unigard, referring to Unigard balances as "in serious dispute." [Ex. # 216]. In April of 1976, Ken Johnson, on behalf of the plaintiff, wrote Mr. Cooper, stating: "As you know we have several unanswered questions which we feel must be resolved before we feel that it would be proper to make a settlement of accounts with the reinsured." He then listed four areas of dispute and ended with the statement: "We cannot agree to this." [Ex. # 217]. On May 10, 1976, Mr. Gentry held a telephone conversation with Mr. Cooper, in which it was verified that Mr. Johnson's letter had been sent to Mr. Seery at Unigard. Mr. Cooper agreed with Mr. Gentry that a meeting on the subject was in order, with reinsurers present, but that Mr. Seery "didn't seem to like [the idea of a meeting]." [Ex. # 218]. On June 2, 1976, Mr. Johnson held a telephone conversation with Mr. Cooper regarding the attempts to settle the accounts due. Mr. Johnson advised Mr. Cooper that "he would be available the week of June 14 or June 21 if they would be ready for [a] test audit." [Ex. # 220].

Thereafter, from June 21 through June 24, 1976, Mr. Johnson spent four days at Unigard's offices in an unsuccessful attempt to determine the true facts and resolve the problems he had previously outlined [Tr. 186:17–195:6, 198:23–202:24]. During his visit, Mr. Johnson was told by Mr. Seery that it would take up to a year to correct "the most obvious errors" in the accounts [Tr. 200:23–201:4; Ex. # 220A]. Mr. Johnson told Mr. Seery that the plaintiffs "would not make a full settlement at [that] time." [Ex. # 220A at 7].

On July 30, 1976, Mr. Johnson wrote Mr. Cooper, with a copy to Mr. Seery, outlining again the four areas of dispute. He closed with the statement: "Please secure the specific information requested above ... so the reinsurers involved may have sufficient information to make an informed decision as to the future course of action" [Ex. # 221].

Thereafter, the plaintiffs began corresponding and meeting between themselves to decide how to handle the problem. On August 6, 1976, Mr. Johnson wrote Mr. Walters, reporting that he had "spent considerable effort in attempting to determine the best approach to take in attempting to arrive at an equitable settlement", and asking for Mr. Walters' guidance [Ex. # 222]. On August 8, 1976, a meeting of Central National's executives was held. At the meeting, it was determined that Central National would gather additional information in order to attempt to negotiate a compromise settlement [Ex. # 223]. On August 17, 1976, Mr. Johnson wrote Maurice Olson, President of Central National, listing the amounts in dispute and the areas of controversy with Unigard [Ex. # 224]. On September 8, 1976, Mr. Walters wrote Donald Ridenour, Comptroller at Calvert, outlining the dollar differences in the accounting with Unigard and stating: "Our legal department is now looking into this whole matter which will take some time as they have to go through the file from beginning to end." [Ex. # 226]. On December 9, 1976, Mr. Sias wrote B. K. Vickery, President of Calvert, reviewing the Unigard

problems. Mr. Sias informed Mr. Vickery that "[a] meeting has been scheduled in Omaha with a Vice President of Unigard and Central National for December 17, 1976, in hopes of resolving these differences and our position will be staunchly supported and defended in your interests." [Ex. # 227].

On December 17, 1976, a meeting was held in Omaha by the principals of Central National, Calvert and Unigard in an attempt to resolve their differences. The effort was unsuccessful. [Ex. # 231].

Thereafter, on December 27, 1976, Mr. Johnson wrote to Mrs. Teru Taketa at Guy Carpenter, making reference to the fact that "Central National is withholding a rather large sum of money pending a settlement of accounts with Unigard . . . ." [Ex. # 228].

On January 5, 1977, Mr. Walters wrote Mr. Vickery, reporting that in December of 1975, he "refused to book any figures [from Unigard] until more accurate figures could be obtained from Unigard or as a result of an audit by [Central National's] staff." [Ex. # 230].

On January 14, 1977, Mr. Vickery sent a report of the December 17, 1976, meeting to Mr. Olson, containing the recommendation that "[s]omething as complex as this situation would have to be reviewed with legal counsel experienced in reinsurance." [Ex. # 231].

On February 15, 1977, Robert Brownley, Vice President of Interemco, Inc., another reinsurer, sent Mr. Johnson a copy of his letter to Mr. Cooper of Guy Carpenter wherein Mr. Brownley cited another problem with the Unigard program. Mr. Brownley called for a review of "this area of concern by all interested parties, including other reinsurers." [Ex. # 232]. No meeting was ever called by Unigard.

On February 18, 1977, H. L. Cummings of Central National's accounting department wrote to Paul Bonn, Central National's Executive Vice President, on the subject of Unigard, stating:

. . . I take exception to the fact that the reports indicate commissions based on gross premiums written before placement of excess reinsurance, the net of which is the amount actually ceded. This resulted in their taking $237,866.88 in excess commissions, as I interpret Article 9 of the treaty.

[Ex. # 233].

In April of 1977, Central National retained Mr. Von Gunten, an outside "Reinsurance Consultant" [Tr. 244:13–21], to review Central National's Unigard files and advise it concerning the situation [Tr. 248:25–249:3]. Mr. Von Gunten's preliminary observations were received on April 7, 1977 [Ex. # 259].

On April 15, 1977, a second meeting was held between the executives of Central National and Unigard in an attempt to arrive at an amicable settlement. Again, the effort was unsuccessful [Tr. 486:5–7; 84:2–14; 85:8–16; Seery depo. (9/26/79) 67:20–69:15]. At that meeting, arrangements were made for Mr. Von Gunten to inspect the books and records of Unigard on behalf of Central National and Calvert [Seery depo. (9/26/79) 69:18–22].

Thereafter, Mr. Von Gunten began his examination of the records at Unigard's offices. On July 8, 1977, Mr. Von Gunten submitted his report of said examination to the plaintiffs, advising that he had found evidence of noncompliance with contract provisions and overcharges totalling $1,197,991.00 [Ex. # 234]. On July 12, 1977, William Kempton, General Attorney for Calvert, forwarded a copy of the Von Gunten report to Mr. Bonn, stating: "Because of the various legal ramification surfaced by this enclosure, I think it is quite urgent that we attempt to meet with George D'Amato in New York City just as promptly as possible and review with him possible options which are available to us." [Ex. # 266; see also Ex. # 234].

On August 22, 1977, the plaintiffs filed this action for rescission.

From the foregoing discussion, it is clear that during this period of time the plaintiffs were not sitting still but were doing all

they could to ascertain facts in order to make an intelligent decision. Indeed, the delay which occurred was due to Unigard's own failure to maintain adequate books and records. This Court will not permit Unigard to take advantage of a delay for which it was responsible as a means for denying plaintiffs their right to rescind.

Moreover, there is no evidence that Unigard was damaged by the delay. The approximately $800,000.00 in premiums which had been submitted to the plaintiffs [Ex. # 267] and which they tendered back at the commencement of this action, is less than the $921,314.00 difference between the premiums paid to the plaintiffs per the December 31, 1973, report rendered [Ex. # 237] and $1,602,856.00, the amount which should have been remitted if the full amount of the unearned premium portfolio transfer and premiums were shown to have totalled the amount ultimately revealed in the First Quarter 1975 report [Ex. # 242; see Ex. # 270]. Therefore, Unigard's claim that by reason of plaintiffs' actions it has lost the use of the money due, is more than offset by the loss of use suffered by the plaintiffs as a result of Unigard's failure to make an accurate December 31, 1973, report. In short, Unigard suffered no harm during the time it took the plaintiffs to investigate the facts and decide on their course of action.

In sum, this Court finds that Unigard's claim of ratification and waiver with respect to the plaintiffs' action for rescission on the basis of misrepresented premium volume, is without merit. The record is clear that, after being put on inquiry as to Unigard's actions, the plaintiffs moved with promptness to ascertain the facts in order to make a cogent decision as to how to proceed. Indeed, by reason of Unigard's conduct, it was only just prior to filing this action, that the plaintiffs had full knowledge of Unigard's misrepresentations and failures to perform. In short, it is this Court's opinion that the limited knowledge and the conduct of the plaintiffs did not constitute a ratification of Unigard's actions or a waiver of the plaintiffs' right to rescind these treaties.

2. Status of Allen, Miller's and Unigard's Excess and Special Risks Department.

■ Moreover, assuming *arguendo* that Unigard's claim of ratification and waiver with respect to the misrepresented premium volume has some merit, it is clear that Unigard's claim of ratification and waiver with respect to the misrepresentations of the status of Allen, Miller's and Unigard's Excess and Special Risks Department does not.

The evidence in this case is clear that the plaintiffs had no knowledge of the true status of Allen, Miller's and Unigard's "Excess and Special Risks Department" until after this action was filed and discovery was undertaken. Prior to the taking of Mr. Seery's deposition in November of 1978, the plaintiffs had no knowledge that there was no Excess and Special Risks Department as an integral division of Unigard and under its supervision and control [Seery depo. (11/3/78) 9:23–10:14]. Likewise, until it received a copy of the "agency agreement" between Unigard and Allen, Miller through discovery measures, the plaintiffs had no knowledge that Allen, Miller was acting as an autonomous managing general agent [Seery depo. (11/3/78) 37:11–29:1].

Indeed, even at that time, Unigard was reluctant to admit that Allen, Miller was a "managing general agent." Both Mr. Cooper and Mr. Seery were evasive when questioned regarding the relationship between Allen, Miller and Unigard [Cooper depo. 55:5–9; Seery depo. (11/3/78) 38:13–39:1]. However, by the time of trial the plaintiffs had discovered many other documents in Unigard's files referring to the Allen, Miller "management agreement." [Ex. # 6, # 7, # 8, # 9, # 11 and # 14], and Mr. Seery was more forthright:

Q. And that arrangement was what, sir?

A. It was termed an Agency Agreement but it was, as far as the industry is concerned, a Managing General Agency Agreement.

[Tr. 368:14–17].

Mr. Cooper was even more defensive when questioned about his employer's prac-

tice with respect to placing for reinsurance the business produced by general managing agents:

Q. *Do you know* what a managing general agency is?

A. *No.*

Q. Have you ever heard that term?

A. Sure.

Q. Have you heard it over the years?

A. You must understand, we are intermediaries, and those terms have meaning for the two principals.

Q. Does Guy Carpenter have any corporate policy about placing or not placing reinsurance on managing general agency business?

A. We have a preference to take our instructions only from the ceding company.

Q. Do you have any corporate policy as to placing or not placing reinsurance on managing general agency business?

A. We have a preference for taking our instructions from the reinsured company.

Q. Leaving your instructions out of it do you have a preference for placing or not placing that type of business?

A. It depends on circumstances.

MR. TROIANO: At what point in time are you talking about specifically?

MR. MATTHEWS: Q. We'll start with now.

A. Now?

Q. Yes.

A. I don't really know, again, that this has much to do with the conversation. I thought our relationships with our clients were confidential.

Q. I'm asking what your policy is. You have a preference.

A. We have a preference.

Q. You take your instructions from the ceding company?

A. From the ceding company.

Q. So you have a preference not to take your instructions from a managing general agent.

A. I didn't say that.

Q. What is your nonpreference. Preference means two things.

A. That's a semantic question. I tell you, we have a preference to take our instructions from the ceding company.

Q. What does that mean? It doesn't mean something to you?

A. It means something.

Q. What does it mean to you?

A. Just as I said it.

Q. Explain it.

A. Excuse me.

MR. TROIANO: I think you have answered the question. That's your answer.

MR. MATTHEWS: I asked you to explain.

A. The explanation is inherent in the choice of the words.

Q. Why do you have that preference?

A. I think that's our own business, isn't it?

Q. I'm asking you why you have that preference.

A. I don't see it has anything to do with the situation today.

Q. That's for the court to rule on later, whether it's material or not. Why do you have that preference?

A. I don't think I can really answer that. It goes back into history.

Q. That's all right.

A. I think that's the witness's answer. [Cooper depo. 57:2–59:13].

From his answers, it is apparent that Mr. Cooper was aware of the fact that he deviated from Guy Carpenter policy when he first approached Unigard about serving "as a writing company for the firm of Allen, Miller & Associates" [Ex. # 48] and when he subsequently placed for reinsurance the Allen, Miller generated volume written on Unigard policies. In fact, Mr. Porter, the

President of Unigard [Porter depo. 2:11–12], was aware of this policy [Porter depo. 81:18–83:12]. Surely, Mr. Sias, as underwriter for Central National and Calvert and one well versed in this field, would also be aware that Guy Carpenter had a rule of not placing reinsurance in this manner.

In Mr. Cooper's June 19, 1973, tender letter [Ex. # 28] to Mr. Sias, Mr. Cooper was arranging reinsurance for a managing general agent. Mr. Young testified that the information supplied with this letter fell far short of custom and practice in the industry as far as disclosing the nature and extent of Allen, Miller's participation in Unigard's program [Tr. 310:17–312:5]. Mr. Sias had no reason to suspect that Guy Carpenter was in this instance deviating from its known policy of not placing reinsurance for managing general agents. Nor did Mr. Sias have any knowledge at this time with respect to the true status of Allen, Miller [Tr. 108:18–109:4]. Indeed, as the evidence indicates, the plaintiffs did not know that Allen, Miller was acting as a managing general agent until after this lawsuit was filed and a copy of the agency agreement was secured through discovery.

Not knowing that Unigard had no Excess and Special Risks Department and not knowing that Allen, Miller was, in fact, an independent managing general agent, the plaintiffs were not in possession of all the facts material to this matter. In absence of such knowledge, in no event can the plaintiffs be held to have ratified the treaties and waived the misrepresentations by Unigard in this regard.

*Statute of Limitations*

Unigard also contends that the plaintiffs' action for rescission is barred by the applicable statute of limitations. From the foregoing discussion regarding Unigard's claim of ratification and waiver, it is clear that this contention is equally without merit.

(a) Applicable Law

Under Nebraska law, an action for fraud must be brought within four (4) years after the discovery of the fraud. Neb.Rev.Stat. § 25–207 (Reissue 1975). In this regard, the court in *Lee v. Brodbeck*, 196 Neb. 393, 397–98, 243 N.W.2d 331, 334 (1976), wrote as follows:

> An action for relief on the ground of fraud must be commenced within 4 years after the discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead to such discovery. If the fraud or mistake ought to have been discovered, the statute will run from the time such discovery ought to have been made. *Burchmore v. H. M. Byllesby & Co.*, 140 Neb. 603, 1 N.W.2d 327 (1941). To avoid the statute of limitations for fraud, plaintiff must plead and prove the impediments to an earlier prosecution of the claim, all facts which relate to or explain the failure to prosecute, and when he first obtained knowledge of the fraud.

(b) Discussion

The Court is of the view that its earlier discussion regarding Unigard's claim of ratification and waiver is summarily dispositive of Unigard's statute of limitations defense. As noted above, the true size of the unearned premium portfolio was not revealed to plaintiffs until November 11, 1975, when it took a $7,000,000.00 leap up from amounts previously reported [Ex. # 270]. Also, as noted previously, the plaintiffs did not know that Unigard had no Excess and Special Risks Department, nor that Allen, Miller was a managing general agent until suit was filed and discovery was initiated. The four year limitations statute on fraud could not commence to run until plaintiffs were informed of the extent of Unigard's misrepresentations. Suit was filed on August 22, 1977. Thus, to bar this suit, the misrepresentations would have had to been known to the plaintiffs prior to August 22, 1973. Clearly, they were not. Therefore, it is obvious that Unigard's defense of statute of limitations is without merit.

CONCLUSION—REMEDY

In summary, the evidence adduced in this action conclusively proves that material

facts were misrepresented to the plaintiffs at the inception of the treaties which plaintiffs relied upon to their detriment and, further, that the defendant, Unigard, failed to discharge essential record keeping and reporting requirements of the treaties, thereby materially breaching the terms of such treaties.

It is also clear that Unigard's defenses of ratification and waiver and statute of limitations are without merit. The plaintiffs did not become aware of the true extent of all of the misrepresentations until after suit was filed and, with respect to those misrepresentations of which it did become aware, the plaintiffs were not guilty of ratification or waiver but rather took reasonably prompt action culminating in this lawsuit.

Under these circumstances, the Court finds that the plaintiffs are entitled to rescission of the treaties from inception. To attempt to determine the dollar amount of damage done to the plaintiffs as a result of Unigard's actions would be next to impossible. Unigard's own officers described the books and records kept by Allen, Miller as a "mess", [Ex. # 81; see also Ex. # 69], an "accounting nightmare", [Ex. # 200], and "grossly in error." [Ex. # 92]. They were never reworked but, rather, Unigard took over, "picked up where Allen, Miller left off", and to the "best of [its] ability put them in a current and correct fashion." [Jorgenson depo. 37:16–21]. Thus, if the treaties are not rescinded, there will be no practical way to completely reprocess the thousands of policy files and make an accurate determination of what should be allocated to whom and what would be owed by the plaintiffs. Rescission of these treaties is, therefore, appropriate.

Having found that rescission is appropriate herein, there are some further matters which must be taken care of in order to finally resolve this litigation. Where rescission is warranted, the objective is to place the parties as nearly as possible in the position they were in prior to execution of the contract or contracts to be rescinded. See Anson v. Grace, supra, 174 Neb. at 264, 117 N.W.2d at 533. In this case, the manner of accomplishing this is for the plaintiffs to return to Unigard all premiums which they have received in excess of the losses which they have paid and, further, for the plaintiffs to be released from further liability to Unigard under these treaties. With respect to the Quota Share and Excess Layered Treaties, it appears that the amount of $779,740.01 must be returned to Unigard [See Ex. # 267]. With respect to the All Risk Treaty, the amount, if any, which must be returned to Unigard has not been clarified to the Court. Accordingly, the Court will order documentation indicating what amount must be returned to Unigard under the All Risk Treaty and will reserve ordering rescission with respect to said treaty until such documentation is received.

Finally, since rescission shall be ordered at this time with respect to the Quota Share and Excess Layered Treaties, the Court finds it unnecessary to consider the issues raised by the counterclaim filed by Unigard which are associated with those treaties.

An order shall be issued contemporaneously herewith in accordance with this Memorandum Opinion.